## **TABLE OF CONTENTS**

I.    STATEMENT OF FACTS ................................................................. 1

      A.    The Events Leading up to the Police Report ........................................ 1

      B.    The Police Report ................................................................. 3

      C.    The Interviews of the Alleged Victims ............................................. 5

      D.    The Arrest and Prosecution ........................................................ 7

      E.    The Continuing Investigation ...................................................... 7

      F.    Plaintiffs' Civil Suit ............................................................ 8

II.   LAW AND ARGUMENT .................................................................... 9

      A.    THERE WAS PROBABLE CAUSE FOR THE ARREST AND
            PROSECUTION OF PLAINTIFF B.R. .................................................. 9

      B.    THE INDIVIDUAL DEFENDANTS ARE ENTITLED TO QUALIFIED
            IMMUNITY FOR THE ARREST AND PROSECUTION OF B.R. ................. 14

            1.    Chief Charles Colucci ..................................................... 15

            2.    Officer Timothy Lamping ................................................... 15

            3.    Assistant Chief Scott Weamer .............................................. 16

            4.    Detective Brian McGivern .................................................. 17

      C.    THE CITY CANNOT BE HELD LIABLE ON A *MONELL* CLAIM. .............. 18

      D.    THE CITY OF CANFIELD IS IMMUNE FROM PLAINTIFFS' STATE
            LAW CLAIMS. ................................................................... 20

      E.    THE INDIVIDUAL DEFENDANTS ARE IMMUNE FROM
            PLAINTIFFS' STATE LAW CLAIMS. ................................................ 22

      F.    THE CANFIELD DEFENDANTS ARE ENTITLED TO SUMMARY
            JUDGMENT ON THE CLAIM FOR MALICIOUS PROSECUTION AS
            THERE WAS PROBABLE CAUSE FOR THE CHARGES.............................. 24

      G.    THE CANFIELD DEFENDANTS ARE ENTITLED TO SUMMARY
            JUDGMENT ON THE CLAIM FOR MALICIOUS PROSECUTION AS
            THEY DID NOT INITIATE THE PROCEEDINGS. .......................................... 25

H.     THE CANFIELD DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON THE CLAIM FOR FALSE IMPRISONMENT AS THERE WAS PROBABLE CAUSE FOR THE ARREST. ................................. 25

I.     PLAINTIFF B.R. CANNOT SUCCEED ON HER CLAIM FOR ABUSE OF PROCESS AS SHE CANNOT PROVE AN IMPROPER MOTIVE FOR HER PROSECUTION. ................................. 27

J.     PLAINTIFFS HAVE FAILED TO STATE A CLAIM FOR A SHAM LEGAL PROCESS. ................................. 28

K.     THERE IS NO EVIDENCE OF AN IMPROPER TOUCHING NEEDED TO SUPPORT A BATTERY CLAIM. ................................. 30

L.     PLAINTIFFS CANNOT ESTABLISH THE EXTREME AND OUTRAGEOUS CONDUCT NEEDED TO SUPPORT A CLAIM FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS. ................................. 30

M.     THE LOSS OF CONSORTIUM CLAIM FAILS AS THERE ARE NO UNDERLYING TORTIOUS ACTS. ................................. 31

N.     DETECTIVE MCGIVERN IS ENTITLED TO JUDGMENT ON PLAINTIFFS' SPOLIATION CLAIM. ................................. 32

O.     PLAINTIFFS CANNOT ESTABLISH A VIOLATION OF THEIR RIGHT TO FAMILIAL ASSOCIATION. ................................. 34

P.     MICHAEL AND RENEE RUBESICH DO NOT HAVE A CLAIM FOR A VIOLATION OF THE RIGHT TO FAMILIAL ASSOCIATION. ................................. 36

Q.     THE INDIVIDUAL DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY ON PLAINTIFFS' CLAIM FOR A VIOLATION OF THEIR RIGHTS TO FAMILIAL ASSOCIATION. ................................. 38

III.     CONCLUSION ................................. 39

# <u>TABLE OF AUTHORITIES</u>

## Cases

*Adkins v. Wolever*, 692 F.3d 499 (6th Cir. 2012) ........................................................ 32

*Ahlers v. Schebil*, 188 F.3d 365 (6th Cir. 1999) ........................................... 11, 17, 18, 31

*Alley v. Bettencourt*, 134 Ohio App.3d 303 (1999) ...................................................... 30

*Anderson v. Creighton*, 483 U.S. 635 (1987) .............................................................. 14

*Barber v. Overton*, 496 F.3d 449 (6th Cir. 2007) ........................................................ 31

*Baryak v. Kirkland*, 137 Ohio App.3d 704 (2000) ....................................................... 25

*Beaven v. United States Department of Justice*, 622 F.3d 540 (6th Cir. 2010) ............................ 32

*Bennett v. Ohio Department of Rehabilitation and Correction*, 60 Ohio St.3d 107 (1991)......... 25

*Campbell v. PMI Food Equipment Group, Inc.*, 509 F.3d 776 (6th Cir. 2007)............................ 32

*Cater v. City of Cleveland,* 83 Ohio St.3d 24 (1998)........................................................ 20, 21

*City of Los Angeles v. Heller*, 475 U.S. 796 (1986)........................................................ 19

*Claybrook v. Birchwell*, 199 F.3d 350 (6th Cir. 2000) .................................................... 31

*Cook v. Cincinnati*, 103 Ohio App.3d 80 (1995) .......................................................... 22

*Criss v. Springfield Township*, 56 Ohio St.2d 82 (1990)................................................. 24

*Devenpeck v. Alford*, 543 U.S. 146 (2004) ............................................................... 9, 10

*Eilerman v. Cargill Inc.*, 195 Fed.Appx. 314 (6th Cir. 2006) .......................................... 32

*Fabrey v. McDonald Village Police Dept.*, 70 Ohio St.3d 351 (1994)................................... 22, 23

*Fisher v. Harden*, 398 F.3d 837 (6th Cir. 2005) .......................................................... 19

*Foos v. City of Delaware*, 492 Fed.Appx. 582 (6th Cir. 2012) ........................................ 37, 38

*Gardenhire v. Schubert*, 205 F.3d 303 (6th Cir. 2000).................................................. 10

*Garrison v. Bobbitt*, 134 Ohio App.3d 373 (1999)....................................................... 23

*Harris v. Bornhorst*, 513 F.3d 503 (6th Cir. 2008)...................................................... 14, 15

*Hazley v. City of Akron* (July 22, 1998) 9th Dist. No. CA18756, 1998 WL 417391 .................... 21

*Henry v. United States*, 361 U.S. 98 (1959) ................................................................. 10

*Hicks v. Leffler*, 119 Ohio App.3d 424 (1997) ............................................................. 23

*Hill v. Urbana*, 79 Ohio St.3d 130 (1997) ................................................................... 20

*Hubbard v. Canton City School Bd. of Educ.,* 97 Ohio St.3d 451 (2002) ................... 20

*Hunter v. Bryan*, 502 U.S. 224 (1991) ......................................................................... 15

*In re D.B.*, 129 Ohio St.3d 104 (2011) ........................................................................ 10

*Jenkins v. Orchards Children's Services*, Case No. 11-13356, 2012 WL 3639116 (E.D. Mich. 2012) .......................................................................................................... 35

*Kavlich v. Hildebrand* (March 12, 2009) 8th Dist. No. 91489, 2009-Ohio-1090 ......... 28

*Kovacic v. Cuyahoga County Department of Children and Family Services*, 724 F.3d 697 (6th Cir. 2013) ......................................................................................................... 38

*LeFever v. Ferguson*, Case Nos. 2:11-cv-935, 2:12-cv-664, 2013 WL 1324299 (S.D.Ohio 2013) .......................................................................................................... 37, 39

*Love v. City of Port Clinton*, 37 Ohio St.3d 98 (1988) ................................................ 30

*Malley v. Briggs*, 475 U.S. 335 (1986) ........................................................................ 15

*Maryland v. Pringle*, 540 U.S. 366 (2003) .................................................................... 9

*McFinley v. Bethesda Oak Hospital*, 79 Ohio App.3d 613 (1992) ............................... 24

*Melanowski v. Judy*, 102 Ohio St. 153 (1921) ............................................................ 24

*Michigan v. DeFillippo*, 443 U.S. 31 (1979) ............................................................... 10

*Mitchell v. Forsyth*, 472 U.S. 511 (1985) ................................................................... 14

*Molnar v. Care House*, 574 F.Supp.2d 772 (E.D.Mich. 2008) ................................... 11

*O'Toole v. Denihan*, 118 Ohio St.3d 374 (2008) ........................................................ 23

*O'Donnell v Brown*, 335 F.Supp.2d 787 (E.D.Mich. 2004) .................................. 35, 36

*Ontha v. Rutherford County, Tennessee*, 222 Fed.Appx. 498 (6th Cir. 2007) ............. 19

*Owner-Operator Indep. Drivers Ass'n v. Comerica Bank*, 860 F. Supp. 2d 519 (S.D. Ohio 2012) .......................................................................................................... 33

*Robbins v. Fry,* 72 Ohio App.3d 360 (1991) ............................................................... 25

iv

*Roelen v. Akron Beacon Journal,* 199 F.Supp.2d 685 (N.D.Ohio 2002)....................................... 31

*Rogers v. Barbera*, 170 Ohio St. 241 (1960) .................................................................. 24, 26, 27

*Russo v. City of Cincinnati,* 953 F.2d 1036 (6th Cir. 1992) ...................................................... 39

*Snyder v. U.S.*, _____ Fed.Appx. _____, 2014 WL 5437999 (6th Cir. Oct. 28, 2014) ................... 14

*State v. Eskridge*, 38 Ohio St.3d 56 (1988)....................................................................... 10

*State v. Martin* (Nov. 24, 2006) 11th Dist. No. 2005-T-004, 2006-Ohio-6202............................ 29

*State v. Roten*, 149 Ohio App.3d 182 (2002) .................................................................... 29

*Thacker v. City of Columbus*, 328 F.3d 244 (6th Cir. 2003)................................................... 18

*Voyticky v. Village of Timberlake, Ohio*, 412 F.3d 669 (6th Cir. 2005) ..................................... 31

*Walsh v. Erie County Department of Job and Family Services*, 240 F.Supp.2d 731 (N.D.Ohio 2003) ................................................................................. 34, 36, 38

*Williams v. McFarland Properties, L.L.C.*, 177 Ohio App. 3d 490 (2008)................................. 21

*Wysong v. City of Heath*, 377 Fed.Appx. 466 (6th Cir. 2010)...................................... 14

*Yaklevich v. Kemp, Schaeffer & Rowe Company, L.P.A.*, 68 Ohio St.3d 294 (1994) ................ 27

**Statutes**

42 U.S.C. §1983 ................................................................................................ 31, 37, 38

O.R.C. §2744.01 ................................................................................................ 20, 21, 22

O.R.C. §2744.02 ................................................................................................ 20, 21

O.R.C. §2744.03 ................................................................................................ 22, 24

O.R.C. §2901.01 ................................................................................................ 26

O.R.C. §2907.02 ................................................................................................ 10, 26

O.R.C. §2907.05 ................................................................................................ 26

O.R.C. §2921.52 ................................................................................................ 28, 29

O.R.C. §2935.03 ................................................................................................ 26

<u>**MEMORANDUM OF LAW**</u>

I.      **STATEMENT OF FACTS**

The present case arises out of the arrest and prosecution of Plaintiff B.R., a then 11 year old girl, on April 20, 2012 for several counts of rape, gross sexual imposition and attempted rape of three 10 and 11 year old girls.   Despite Plaintiffs' best attempts to second guess the investigation in light of subsequent events, including the juvenile court's finding that the allegations were "Not True," the facts and the applicable law reveal that the officers possessed probable cause to arrest and prosecute Plaintiff B.R.

A.      **The Events Leading up to the Police Report**

On Monday, April 16, 2012, Jade Mersing was vacuuming her daughter C.M.'s bedroom and noticed a message on C.M.'s chalkboard written by C.M.'s friend F.S.  Incident Report at CAN000004.  An unredacted copy of the report was introduced as Exhibit 1 in the deposition of Brian McGivern, and is filed under seal as Exhibit "A."  The message referred to F.S. being "raped by her best friend" and that she wanted to "move away in order to get away from the situation." *Id.*  F.S. had been at C.M.'s house that weekend for a sleepover.  *Id.*  After finding the message, Mrs. Mersing contacted F.S.'s mother to advise of the chalkboard message.  *Id.*

Mrs. Mersing then spoke with C.M. and her friend R.B. about the message on the chalkboard after they returned from school that afternoon.   Incident Report at CAN000005.  C.M. provided some additional details regarding the alleged rape to her mother.  *Id.*  Mrs. Mersing inquired of C.M. as to whether she had ever had any similar incidents occur to her.  *Id.*  C.M. replied that B.R. had "humped her." *Id.*

Later that same day, C.M. provided her mother, Mrs. Mersing, an additional note that F.S. had written regarding the alleged attack.   Incident Report at CAN000005.   The note

1

provided specific details of what had occurred during the alleged attack.  *Id.*  Mrs. Mersing again asked C.M. if anything similar had happened to her.  *Id.*  C.M. initially denied that, but later in the evening C.M.'s friend, R.B., told Mrs. Mersing that C.M. had been similarly attacked at a sleepover during spring break.  *Id.*  Later in the evening, R.B. disclosed to Mrs. Mersing that she had also been attacked by B.R.  *Id.*

After learning of these events, F.S.'s father, Donald Slater, contacted an acquaintance, retired Chief of Police David Blystone, to seek advice on how to address the allegations. Deposition of David Blystone, November 22, 2013 at 15 (hereinafter "Blystone Depo").  Mr. Blystone was unable to give him detailed guidance as he was not told the specific details of the alleged incidents.  *Id.*  Mr. Blystone indicated that if it was his daughter that he would go and speak with a law enforcement agency.  *Id.*  Mr. Blystone recalls Mr. Slater being frustrated and not certain how to proceed with the situation.  *Id.* at 19.  Mr. Slater also wanted to make certain that any improper behavior was stopped.  *Id.*

Mr. Slater asked what options he had.  Blystone Depo at 22.  Mr. Blystone advised him that Mr. Slater could go to a police department or the sheriff's office and file a report at any time of the day.  *Id.*  Mr. Blystone also advised that Mr. Slater could go to a law enforcement agency and speak with somebody first.  *Id.*  Mr. Blystone indicated that if Mr. Slater wished to speak with someone that he should likely go during the daytime hours to speak with an investigator. *Id.*  He further advised Mr. Slater that once the investigator knew the whole story then they would be able to further advise Mr. Slater on what to do.  *Id.*  Based on their conversation, it appeared that Mr. Slater felt that he would go in person to speak with someone.  *Id.*

Mr. Blystone offered to and subsequently did contact Chief Colucci to advise him that there may be someone coming in who was concerned that his daughter may have been sexually

assaulted and that the assault may have occurred during a sleepover in the city.  Blystone Depo at 22-23.  Chief Colucci advised that the officers would hear out the individual when he came in and determine how to proceed from there.  *Id.*  Despite Plaintiffs' allegations and implications, there was no discussion about the merits of the claims, a preferred outcome for the investigation or any request for preferential treatment.

### B.  The Police Report

Following the April 16, 2012 telephone call, Chief Colucci briefly spoke with Detective Brian McGivern to provide him with Mr. Slater's telephone number and request that he follow up with the individual about a potential incident involving his daughter.  Deposition of Brian McGivern, May 30, 2014 at 30.  No further directives were given to him with respect to handling or investigating those allegations.  Det. McGivern testified that it is not uncommon for someone to contact the Chief and request to speak to a detective.  *Id.* at 31.  However, he "wouldn't expect" and does not believe that "the Chief would expect any favoritism in any case."  *Id.* at 29.

At approximately 10:00 a.m. on April 17, 2012, Mr. Slater went to the Canfield Police Department to report F.S.'s written notes, as well as his subsequent discussions with F.S.  Incident Report at CAN000004.  Mr. Slater advised that his daughter claimed to have been sexually assaulted by B.R. on two different occasions in February of 2012 while B.R.'s parents were out of the house.  *Id.*  F.S further reported that the encounters were forceful.  *Id.*  Mr. Slater advised that C.M. and R.B. also reported having been assaulted by B.R.  *Id.* In response to those allegations, the police department contacted the parents of C.M. and R.B.  *Id.*

Detective McGivern and Officer Lamping, who was completing his field training that week, spoke with Mrs. Mersing later that day.  Deposition of Timothy Lamping, February 12, 2014, at 55; Incident Report at CAN000004.  Mrs. Mersing confirmed finding the chalkboard

message as well as her discussions with C.M. and R.B.  *Id.*  She provided the police with F.S.'s handwritten note, which contained a detailed description of the alleged sexual assault by B.R. *Id.* at CAN000005.  A copy of that note is attached hereto as Exhibit "B."  Mrs. Mersing reported that C.M. and R.B. told her that B.R. threatened them to remain silent, claiming that she would deny all accusations and accuse C.M. and R.B. of sexually assaulting her.  *Id.*  B.R. also threatened that she would spread rumors at school that the girls were lesbians.  *Id.*

Finally, Officer Lamping and Detective McGivern spoke with Jennifer Young, the mother of R.B.  Incident Report at CAN00005.  Mrs. Young advised that Mrs. Mersing had discussed with her the alleged sexual contact between B.R., R.B. and C.M.  *Id.*  Mrs. Young reported that she spoke with R.B. regarding the allegations and that R.B. confirmed that B.R. had sexually assaulted her during a sleepover at R.B.'s house.  *Id.*  R.B. states that she told B.R. she did not want to continue this type of behavior and that B.R. then began bullying R.B.  *Id.*  As part of that bullying, B.R. allegedly started rumors that R.B. was a lesbian.  *Id.*  Mrs. Young recalled R.B.'s behavior changing towards B.R. this past winter.  *Id.*  After conducting the initial interviews with the parents, Det. McGivern felt that there was enough information to warrant a further investigation.  McGivern Depo at 64.

Detective McGivern updated Chief Colucci on the investigation.  Deposition of Charles Colucci, February 11, 2014 at 52.  He then spoke to Prosecutor Anissa Modarelli and advised her of the nature of the case.  McGivern Depo at 38.  An officer went to the Mersing residence and photographed the chalkboard message left by F.S.  Deposition of Scott Weamer, February 12, 2014, at 126-127.

On Pros. Modarelli's advice, Det. McGivern contacted Children Services to advise them of the matter and request their assistance.  McGivern Depo at 26, 38.  Children Services was

4

unable to provide interview facilities for another three weeks. *Id.* at 85. During the initial investigation, the police became aware that B.R. was having a sleepover at her house that weekend. *Id.* at 84. The alleged sexual assaults all occurred during sleepovers. Deposition of Anissa Modarelli, May 29, 2014 at 30. This raised concerns that there may be additional victims at this upcoming sleepover, such that the department wished to investigate these allegations prior to the April 20 party. *Id.* The department worked with Children Services to do the interviews at the police department, which had video and audio recording capabilities, private interview rooms and video monitoring available to the parents, prosecutor and the officers. *Id.* at 29.

C.    **The Interviews of the Alleged Victims**

Mahoning County Children Services' worker Kim Woods came to the Canfield Police Department on April 20 to conduct forensic interviews of the three girls, F.S., C.M. and R.B. Deposition of Kim Woods, February 3, 2014 at 113. The interviews were recorded. Copies of those interviews are being filed under seal as Exhibit "C." During the interviews, Ms. Woods was alone in the room with the girl being interviewed. The parents of that child were offered the opportunity to monitor the interview on a live feed. Incident Report at CAN000006-7. The interviews were also watched by Detective McGivern and Mahoning County Assistant Prosecutor Anissa Modarelli. McGivern Depo at 105; Modarelli Depo at 117, 229. The later interviews were also monitored by Assistant Chief Scott Weamer. Weamer Depo at 39.

The interviews conducted by Ms. Woods resulted in detailed disclosures about the alleged attacks. Exhibit "A" at CAN000006-7; Exhibit "C." The method of the assault was largely similar, though the specific details of each attack varied between the witnesses. At the conclusion of the interviews, Ms. Woods, Detective McGivern, Prosecutor Modarelli, Assistant Chief Weamer and Officer Lamping all found the girls to be believable and truthful in their

statements.  Woods Depo at 135, McGivern Depo at 65, Modarelli Depo at 57, 90, Weamer Depo at 40, Lamping Depo at 110.  At this time, Prosecutor Modarelli advised Det. McGivern that there was sufficient evidence to charge B.R.  Modarelli Depo at 90, McGivern Depo at 138.

Detective McGivern then interviewed B.R.  McGivern Depo at 77.  As B.R. was a minor, her mother accompanied her during the interview.  *Id.*  Throughout the questioning, B.R. consistently denied any improper contact with the three girls.  See Recorded Interview, Exhibit "C," Exhibit "A" at CAN00009-10.  She was very hesitant in her responses to the questions, would frequently freeze when a question was asked to her, and generally engaged in behavior which caused Detective McGivern and Assistant Chief Weamer to question her credibility. McGivern Depo at 77; Weamer Depo at 50.

During the course of the discussions with the girls' parents, Det. McGivern learned that all of the girls had been having difficulty at school.  McGivern Depo at 137-138.  Based upon this information and the magnitude of the charges and allegations, Det. McGivern wished to speak to the three girls again to confirm that they were being truthful in what they told Ms. Woods earlier that day.  *Id.* at 169-170, Weamer Depo at 51.

Det. McGivern interviewed F.S., C.M. and R.B. a second time.  Prior to these interviews, each of the girls was given their Miranda warnings.  McGivern Depo at 169-170.  If the girls falsified their stories, the intent was to arrest them.  *Id.* at 170.  Det. McGivern then proceeded to question the girls with respect to their statements, and the truthfulness of those statements.  See Recorded Interview, Exhibit "C," Exhibit A at CAN000010.  The girls continued to confirm that the statements that they had given Ms. Woods were truthful.  *Id.*

## D.    The Arrest and Prosecution

Based on the statements of the three girls, the prosecutor again confirmed that there was probable cause to arrest B.R. for the charge of rape.  Modarelli Depo at 90.  She then made arrangements with the appropriate individuals at the juvenile detention center to arrange for a team for B.R. to provide her counseling and to begin the necessary process for B.R. to be released from the detention center as soon as possible.  *Id.* at 199-201.  Det. McGivern placed B.R. under arrest, and later walked her to the car.  Despite the City's policies preferring that handcuffs be used during an arrest and transport, B.R. was not handcuffed by Canfield at any time.  Deposition of Mark Meshula, February 5, 2014 at 14.

B.R. was taken to the juvenile detention center on Friday, April 20.  Her arraignment was set for Monday, April 22.  Modarelli Depo at 67.  Due to a conflict with her counsel's schedule, the arraignment was continued to Tuesday, April 23.  *Id.*  At that time B.R. was placed on electronically monitored home detention and was remanded to the care of her grandmother.

## E.    The Continuing Investigation

After the arrest, the investigation continued into the allegations.  In May, B.R. filed a criminal complaint against R.B. alleging that R.B. had sexually assaulted her.  Exhibit "A" at CAN000014.  The complaint was investigated, but no further charges were filed.  During the investigation of B.R.'s complaint, R.B. was interviewed and subsequently told Det. McGivern that while the behavior previously alleged by her occurred between her and B.R., that the behavior was not forced.  Exhibit "A" at CAN000015.  Rather, R.B. reported that she did not want to engage in that behavior, but consented to do so after repeated urging by B.R.  *Id.*

C.M. and F.S. were reinterviewed in connection with the new allegations. C.M. reported that while there was some consensual behavior between her and B.R., the behavior went beyond

the bounds of her consent. Exhibit "A" at CAN000015. C.M. remained steadfast in her statement that sexual contact occurred between her and B.R. which she had not wanted and to which she did not consent. *Id.*

F.S. admitted that on one occasion she observed B.R. engage in what appeared to be consensual sexual contact with R.B. Exhibit "A" at CAN000016. F.S. further admitted that she lied in her initial interview about who showed her pornography. *Id.* F.S. now stated that R.B. had shown the girls pornography but that R.B. had told F.S. to say that B.R. had shown them pornography. *Id.* F.S. remained adamant that all remaining statements, including the allegations of being forcefully raped by B.R. remained true. *Id.* The new allegations and information was relayed to the prosecutor. McGivern Depo at 135, Modarelli Depo at 143. The juvenile delinquency trial proceeded, and the allegations against B.R. were found "Not True."

**F.    Plaintiffs' Civil Suit**

On April 23, 2013, Plaintiffs filed their Complaint against Canfield, Chief Colucci, Assistant Chief Weamer, Det. McGivern, Officer Lamping, Mahoning County Sheriff's Deputy Major Allen and Mahoning County Prosecutor Anissa Modarelli alleging violations of her constitutional rights and various state law claims. Plaintiffs subsequently dismissed the claims against Prosecutor Modarelli and Major Allen. Plaintiffs' Second Amended Complaint alleges a violation of B.R.'s Fourth Amendment rights, a violation of her Fourteenth Amendment right to familial associations, a *Monell* claim against the City, and state law claims for malicious prosecution, abuse of process, false imprisonment, a sham legal process, battery, intentional infliction of emotional distress, loss of consortium, and spoliation. The Canfield Defendants timely answered the Second Amended Complaint. The parties have conducted written discovery and numerous depositions have been taken.

The Canfield Defendants now seek summary judgment with respect to Plaintiffs' claims. Plaintiffs'' claims lack merit as there was probable cause for the arrest and prosecution of Plaintiff B.R.  In addition, the Canfield Defendants acted on the advice of and in consultation with the prosecutor.  Further, the individual Defendants are entitled to qualified immunity in this matter.  All Defendants are immune from Plaintiffs' state law claims pursuant to Ohio Revised Code Chapter 2744.  Plaintiffs' *Monell* claim is barred as there was no underlying constitutional violation and further there is no evidence that any policy or procedure caused the alleged constitutional violation.

## II.     LAW AND ARGUMENT

### A.     THERE WAS PROBABLE CAUSE FOR THE ARREST AND PROSECUTION OF PLAINTIFF B.R.

Plaintiff B.R. alleges that her arrest and subsequent criminal prosecution violated her rights under the Fourth Amendment to the United States Constitution.  The Fourth Amendment protects individuals from unreasonable searches and seizures.  U.S. Const. amend. IV.  "A warrantless arrest by a law officer is reasonable under the Fourth Amendment where there is probable cause to believe that a criminal offense has been or is being committed."  *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004).   "The probable-cause standard is a practical, nontechnical conception that deals with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act."  *Maryland v. Pringle*, 540 U.S. 366, 370 (2003) (internal citations omitted).

"Probable cause is a fluid concept - turning on the assessment of probabilities in particular factual contexts - not readily, or even usefully, reduced to a neat set of legal rules."  *Maryland,* 540 U.S. at 370-71.  In determining probable cause, the court looks to the "reasonable conclusion to be drawn from the facts known to the arresting officer at the time of arrest."

9

*Devenpeck*, 543 U.S. at 152.  When the totality of the circumstances, including the exculpatory and inculpatory evidence, would cause a prudent man to believe that an offense has been committed, then probable cause exists for an arrest.  *See Henry v. United States*, 361 U.S. 98, 102 (1959); *Gardenhire v. Schubert*, 205 F.3d 303, 318 (6th Cir. 2000).  The propriety of the arrest does not depend on whether the suspect actually committed a crime.  *Michigan v. DeFillippo*, 443 U.S. 31, 36 (1979).

B.R.'s arrest was supported by three eyewitness statements from the alleged victims.  The girls described the assaults that occurred in detail, including B.R. allegedly showing the girls pornography, removing the girls' clothing, acts of oral sex being forced on the girls, as well as the girls being forced to perform oral sex, digital vaginal penetration and in one case with a foreign object, and anal penetration.  The girls reported alleged threats that B.R. would either hurt or kill them if they told anyone.

O.R.C. §2907.02 defines rape.  Rape includes any sexual conduct with someone less than 13 years of age; however, that section has been determined unconstitutional when both the alleged victim and the alleged offender are under 13 years of age and there are no allegations of force.  O.R.C. §2907.02(A)(1)(b); *In re D.B.*, 129 Ohio St.3d 104, ¶24 (2011).  An alleged offender under 13 years of age can still be guilty of rape if he or she substantially impairs the other person's judgment, control or ability to resist, if consent is substantially impaired due to a mental or physical condition, or if the other individual is compelled to submit by force or threat of force.  *Id.* at ¶28.  Force exists where the victim's will is overcome by fear or duress.  *State v. Eskridge*, 38 Ohio St.3d 56, 59 (1988).

Each of the girls advised that they were pinned onto the bed prior to the incidents and that the sexual acts which occurred were done by force, including reporting that B.R. allegedly

pushed their head towards B.R.'s naval region in order to initiate oral sex.  Exhibit "A" at

CAN000006-8.  B.R. also allegedly threatened C.M. to perform oral sex on her or else B.R.

would kill her.  *Id.* at CAN000007.  These statements show probable cause to believe that the

crime of rape or gross sexual imposition occurred.

> An eyewitness identification will constitute sufficient probable cause to arrest
> unless, at the time of arrest, there is an apparent reason for the officer to believe
> that the eyewitness was lying, did not accurately describe what he had seen, or
> was in some fashion mistaken regarding his recollection of the confrontation.

*Ahlers v. Schebil*, 188 F.3d 365, 370 (6th Cir. 1999).

A child victim's statements concerning alleged sexual abuse are sufficient to establish probable

cause unless there are inconsistent statements given by that child.  *Molnar v. Care House*, 574

F.Supp.2d 772, 792 (E.D.Mich. 2008).  Where a child victim gives consistent statements which

are believed by those involved in the interview and investigation, those statements are sufficient

to establish probable cause for arrest.  *See id.*

F.S., C.M. and R.B. were interviewed by Children Services' investigator Kim Woods.

The interviews were monitored by Det. McGivern and Officer Lamping, and several of the

interviews were also monitored by Assistant Chief Weamer and Mahoning County Prosecutor

Anissa Modarelli.  All of the individuals who monitored the interviews reached the same

conclusion – the girls were believable.  Woods Depo at 135, McGivern Depo at 65, Modarelli

Depo at 57, 90, Weamer Depo at 40, Lamping Depo at 110.  There were no indicators that the

girls were lying or misrepresenting what occurred.  Pros. Modarelli further testified that she told

Det. McGivern that there was probable cause to charge B.R. with the crimes.  Modarelli Depo at

90.  Based on the information known to the Canfield Defendants, the girls' statements alone

were sufficient to establish probable cause for arrest.

Plaintiffs allege that the Canfield Defendants failed to conduct a thorough investigation. Plaintiffs' expert, Thomas Parker, alleges that Det. McGivern failed to consider three pieces of evidence.  First, he alleges that Det. McGivern did not consider statements regarding alleged bullying between the girls and evidence that the girls were getting along around the time of the allegations.  Deposition of Thomas Parker, January 20, 2015 at 92.  Det. McGivern was aware of these concerns and addressed them by conducting a second interview of the alleged victims. McGivern Depo at 137-138.  Mr. Parker relies on a statement in the school records that things "may be back on track" between the girls, which he admits was equivocal.  Parker Depo at 92. He further admitted that the principal's statement regarding the girls' interactions could possibly lead to exculpatory evidence, but that as it was written he "couldn't make a call one way of the other" on whether it was exculpatory or would lead to exculpatory evidence.  Parker Depo at 99. Moreover, Mr. Parker confirmed that the fact that the girls were appearing cordial while in a larger group setting did not prove B.R.'s innocence.  Parker Depo at 121.

Mr. Parker next relies upon an email allegedly written by Jade Mersing, the mother of one of the alleged victims.  The email relays that "police said after the information from the girls' interviews is compiled, charges may be brought tomorrow evening."  The admissibility of this statement into evidence in this case is questionable at best as it is unauthenticated and constitutes hearsay.  Regardless, Mr. Parker also admitted that the statement charges "may be brought" indicates that charges may be filed or that charges may not be filed depending on the outcome of the interviews.  Parker Depo at 190.

Finally, Mr. Parker states that B.R.'s denials of any wrongdoing constituted exculpatory evidence.  Det. McGivern was aware of these denials and considered them in the investigation. However, Det. McGivern also explained B.R.'s actions and mannerisms during the interview

indicating to him that she was not being truthful with her statements.  McGivern Depo at 77.
Plaintiffs' expert's testimony demonstrates no exculpatory evidence was ignored by Defendants
and no exculpatory evidence or other evidence demonstrated the accusers were not to be
believed.  Further,

> [o]nce probable cause is established, an officer is under no duty to investigate
> further or to look for additional evidence which may exculpate the accused. In
> fact, law enforcement is under no obligation to give any credence to a suspect's
> story [or alibi] nor should a plausible explanation in any sense require the officer
> to forego arrest pending further investigation if the facts as initially discovered
> provide probable cause."
>
> *Ahlers v. Schebil*, 188 F.3d at 371 (internal citations omitted).

F.S., C.M. and R.B. were found credible by those involved with the investigation.  There
were no facts showing they were untruthful or not to be believed.  Det. McGivern re-interviewed
the three girls after learning of problems that the girls were having at school in order to ensure
that the girls were not embellishing or fabricating their allegations.  *Id*. at 137-138.  The girls
remained consistent in their statements and denied any falsifications.

Plaintiffs will likely rely on subsequent records received from the girls' school, as well as
some post-arrest modifications by two of the girls to their initial statements.  However, these
later developments are not sufficient to prove that there was no probable cause for the initial
arrest. Further, Defendants provided all information to the prosecutor and have no liability for
the prosecutor's decision to continue forward with the prosecution.  As recognized by the Sixth
Circuit Court of Appeals:

> We have already rejected the argument that  '[when] subsequent developments
> disprove the correctness of a previous police determination that probable cause
> exists, …the police no longer have justification under the Fourth Amendment to
> continue the incarceration, and must release the suspect.'  We stated in *Peet* stated
> (sic) that policy does not support a requirement that investigators 'reevaluate
> probable cause constantly with every additional witness interview and scrap of
> evidence collected.'

*Wysong v. City of Heath*, 377 Fed.Appx. 466, 470 (6th Cir. 2010).

The probable cause established by the girls' statements was sufficient to support the arrest and the Canfield Defendants were under no obligation to continue their investigation further at that time. *Ahlers, supra*. There was no exculpatory evidence ignored by the investigators in making their probable cause analysis (notwithstanding that they did continue their investigation post-arrest). There is no evidence rebutting the presumption of the reliability and veracity of the alleged victim statements at the time of the arrest. As there was probable cause for B.R.'s arrest and prosecution, the Canfield Defendants are entitled to judgment in their favor with respect to her claim for a violation of her Fourth Amendment rights.

**B.    THE INDIVIDUAL DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY FOR THE ARREST AND PROSECUTION OF B.R.**

In this case, the individual Defendants are entitled to qualified immunity for their respective roles in the underlying investigation.

"Qualified immunity" is an "immunity from suit" which relieves government actors from standing trial for civil liability resulting from tortious acts committed while performing discretionary functions. *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). "As long as [an officer's] actions would reasonably have been thought consistent with the rights they are alleged to have violated," the immunity applies. *Anderson v. Creighton*, 483 U.S. 635, 638 (1987); *Snyder v. U.S.*, _____ Fed.Appx. _____, 2014 WL 5437999 (6th Cir. Oct. 28, 2014).

Plaintiffs bear the burden of demonstrating a defendant is not entitled to qualified immunity. *Harris v. Bornhorst*, 513 F.3d 503, 520 (6th Cir. 2008). An arresting officer is entitled to qualified immunity if he or she could reasonably (even if erroneously) have believed that the arrest was lawful, in light of clearly established law and the information possessed at the

14

time by the arresting agent. *Harris, supra* at 511, *citing Hunter v. Bryan*, 502 U.S. 224 (1991).

"The qualified immunity standard 'gives ample room for mistaken judgment' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" *Hunter v. Bryant*, 502 U.S. 224, 229 (1991), *citing Malley v. Briggs*, 475 U.S. 335, 343 (1986).  The particularized qualified immunity issue at bar is whether a reasonable police officer would have concluded that there were facts indicating the accusers were not to be believed, so as to rebut the presumption of probable cause created by their statements.

As each Defendant had a separate role, they will be addressed separately below.

### 1.  Chief Charles Colucci

Chief Colucci was updated during the investigation, and provided input with respect to the existence of probable cause.  Colucci Depo at 42, 44, 50-51.  He received the brief telephone call from Mr. Blystone that someone would be coming to the police department to report a possible sexual assault, and alerted Det. McGivern to that fact.  *Id.* at 91.  He assisted in expediting the interviews by Children Services.  *Id.* at 96.  He did not conduct any interviews, observe any interviews, collect any evidence or sign the criminal complaints.  *Id.* at 42, 44.  He was not involved in B.R.'s physical arrest or her transportation to the juvenile detention center. Prosecutor Modarelli alone made the decision there was probable cause to prosecute.  Modarelli Depo at 16.  Chief Colucci's limited involvement was not such that a reasonable officer in his position would conclude that the girls were not believable so as to rebut the presumption of probable cause created by their statements.  Chief Colucci is protected by qualified immunity.

### 2.  Officer Timothy Lamping

At the time of the initial complaints against B.R., Officer Lamping had been employed at the police department for slightly over one month, having been hired in February 2012.

Lamping Depo at 9.  This was his first position as a police officer.  *See* Lamping Depo at 8.  Officer Lamping was still undergoing his field training and was assigned to shadow Det. McGivern for the week.  *Id.* at 13.

As a trainee, Officer Lamping shadowed the officers involved.  Lamping Depo at 82.  He viewed the interviews conducted by Kim Woods, and part of B.R.'s interview.  *Id.* at 21.   He did not interview any of the alleged victims or B.R.  He was not asked his opinion with respect to the credibility of the witnesses, or any other aspect of the case.  *Id.*  He wrote part of the incident report as part of his training.  *Id.* at 13.   Report writing does not implicate any constitutional amendment or constitutional right.  Further, he did not exercise any independent judgment with respect to the course or the outcome of the investigation.  Given his minor participation, Officer Lamping was not in possession of any facts that would cause a reasonable officer to conclude the accusers were not credible so as to rebut the presumption of probable cause created by the accusers' statements.  Accordingly, Officer Lamping is entitled to qualified immunity.

### 3.  Assistant Chief Scott Weamer

Assistant Chief Weamer is the supervising officer in charge of the detective bureau.  Weamer Depo at 20.  He became involved in the case when alerted to it by Det. McGivern after the interview of the first alleged victim, R.B., had been completed.  *Id.* at 25.  Assistant Chief Weamer observed the remainder of the interviews over the video feed, including Det. McGivern's interview of B.R.  *Id.* at 28.  He sat in on the second interviews of the three girls, but did not participate in the questioning.  *Id.* at 41, Exhibit "C."  He consulted with Det. McGivern as to whether the girls or B.R. were credible, and assisted in evaluating probable cause.  *Id.* at 28, 34, 130-131.  Again, Prosecutor Modarelli testified that she alone made the decision there was probable cause to prosecute B.R.  Modarelli Depo at 16.

16

In determining probable cause, Assistant Chief Weamer considered the forensic interviews, and the credibility determinations of Ms. Woods, Det. McGivern and Prosecutor Modarelli, in addition to his own evaluation of the girls' credibility.  Weamer at 130-131.  He also considered the delay in reporting the events, the fact that the girls were having difficulty at school (which he admitted suggested a motive for deception which caused the officers to conduct the second interview of the three girls), and the lack of physical evidence.  *Id.* at 131-133.  When all of these factors were taken together, he believed there was probable cause for the arrest.  This belief was confirmed after he spoke with Prosecutor Modarelli.  *Id.* at 120.

An officer is entitled to rely on a witness' statements in evaluating probable cause. *Ahlers, supra.*  Assistant Chief Weamer did so in this case, and factored those statements into the totality of the circumstances known to the officers at the time probable cause was evaluated. Given the case law in this situation, a reasonable officer would conclude that he could believe the accusers, supporting a finding of probable cause.  Accordingly, Assistant Chief Weamer is entitled to qualified immunity.

### 4.  Detective Brian McGivern

Detective McGivern served as the lead investigatory officer on this case.  Weamer Depo at 102.  He arranged for and reviewed the interviews by Kim Woods.  McGivern Depo at 84-85. He conducted the interview of B.R., after Ms. Woods advised that she did not conduct interviews of the alleged perpetrators.  McGivern Depo at 86.  He conducted the second interviews with the alleged victims prior to charges being filed.  Weamer Depo at 51.  Det. McGivern in consultation with Assistant Chief Weamer and Prosecutor Modarelli evaluated whether probable cause existed to support the arrest and criminal charges.  Weamer Depo at 120.

In approaching this case, Det. McGivern brought his fourteen years of experience as a law enforcement officer to bear on his decisions as to how to investigate the case, and in making determinations of credibility. McGivern Depo at 75. The evidence known to the officers at the time, and the opinions of all those who had watched the interviews, was that the alleged victims were credible. Woods Depo at 135, McGivern Depo at 65, Modarelli Depo at 57, 90, Weamer Depo at 40, Lamping Depo at 110. The prosecutor, who had also watched the interviews, also believed there was probable cause for the arrest. McGivern Depo at 122, Weamer Depo at 120. This established probable cause for B.R.'s arrest and prosecution. *Ahlers, supra.* Det. McGivern was entitled to rely on the statements of the alleged victims as there was no evidence indicating the alleged victims were not to be believed, and had no duty to further investigate after their statements provided probable cause for the arrest. *Id.*

There are no facts which would have informed a reasonable police officer the believability of the accusers was undermined such that his personal belief in their veracity was unconstitutionally unreasonable. To the contrary, a reasonable officer on the totality of facts could have found the accusers credible creating a presumption of probable cause and entitling Det. McGivern to qualified immunity. "Insofar as the question of probable cause here is a close one, reasonable officials could disagree as to whether probable cause existed…thus, the defendant officers are entitled to qualified immunity…" *Thacker v. City of Columbus*, 328 F.3d 244, 260 (6th Cir. 2003). Det. McGivern is entitled to qualified immunity.

C.    **THE CITY CANNOT BE HELD LIABLE ON A *MONELL* CLAIM.**

To succeed on a claim against the City of Canfield, Plaintiffs must prove that a policy, custom or practice of the City resulted in a violation of their constitutional rights. The City cannot be held liable in the absence of a constitutional violation. *City of Los Angeles v. Heller*,

18

475 U.S. 796, 799 (1986).  As shown above, the Canfield Defendants did not violate B.R.'s constitutional rights as there was probable cause for her arrest and prosecution.

Plaintiffs alleged Canfield was deliberately indifferent to its officers' training.  Deliberate indifference is a stringent standard, requiring proof that a municipal actor disregarded a known or obvious consequence of his action.  *Fisher v. Harden*, 398 F.3d 837, 849 (6th Cir. 2005).  This requires prior instances of unconstitutional conduct proving that the defendant ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause injury.  *Id.*  Liability attaches only if a constitutional violation is "part of a pattern" of misconduct, where there is a complete failure to train, or where training is so reckless or grossly negligent that future misconduct is almost inevitable or substantially certain to occur.  *Ontha v. Rutherford County, Tennessee*, 222 Fed.Appx. 498, 504 (6th Cir. 2007).

Det. McGivern received training with respect to interrogation and investigation of claims involving juveniles.  McGivern Depo at 75, 120-121, 164; Canfield Response to Interrogatory No. 24, a copy of which are attached hereto as Exhibit "D."  He had previously investigated cases involving juveniles, though this was the first claim the City had received involving rape allegations between children this young.  McGivern Depo at 161, Canfield Response to Interrogatory No. 21.  There is no evidence Canfield should have or would have anticipated such an alleged crime occurring between such young girls as to make a need for specialized training apparent to avoid any alleged constitutional violations.  There is no indication or allegation that there were any constitutional violations or improprieties associated with the other sexual misconduct cases involving juveniles.

Det. McGivern had been trained in general interrogations and investigations.  His training included sections on how to interact with and question minors.  There was no indication that the

training that he received had been inadequate and further no complaints or issues of past constitutional violations in the other cases that he handled.  There is no evidence to show that Canfield was deliberately indifferent to any need to provide further training to its officers.

**D.    THE CITY OF CANFIELD IS IMMUNE FROM PLAINTIFFS' STATE LAW CLAIMS.**

The City of Canfield is a political subdivision within the meaning of O.R.C. §2744.01(F). As such, it is entitled to immunity from tort liability for governmental and proprietary functions. O.R.C. §2744.02(A)(1).   O.R.C. §2744.02(A)(1) provides immunity to political subdivisions from damages for injury, death or loss to person or property:

> For the purposes of this Chapter, the functions of political subdivisions are hereby classified as governmental functions and proprietary functions.  Except as provided in division (B) of this section, a political subdivision is not liable in damages in a civil action for injury, death, or loss to person or property allegedly caused by any act or omission of the political subdivision or an employee of the political subdivision in connection with a governmental or proprietary function.

In general, a political subdivision is not liable in damages.  O.R.C. §2744.02 (A)(1); *Hubbard v. Canton City School Bd. of Educ.,* 97 Ohio St.3d 451, ¶10 (2002).  The general grant of immunity is subject only to the five exceptions set forth in O.R.C.  §2744.02(B).  *Hill v. Urbana,* 79 Ohio St.3d 130, 133 (1997).  If none of the O.R.C. §2744.02(B) exceptions apply, then the subdivision is immune from suit.  See *Cater v. City of Cleveland*, 83 Ohio St.3d 24, 28 (1998).

O.R.C. §2744.02(B) revokes immunity for losses caused by the negligent operation of a motor vehicle, losses due to the negligent performance of employees with respect to proprietary functions of the political subdivision, losses due to a subdivision's failure to keep public roads in repair, losses due to injury occurring as a result of a physical defect within or on the grounds of

buildings used for governmental functions or where civil liability is expressly imposed by another provision of the Revised Code.  None of these exceptions apply in the present case.

The Second Amended Complaint contains no allegations that Canfield, Chief Colucci, Assistant Chief Weamer, Det. McGivern, Officer Lamping or any other City employee negligently operated a motor vehicle.  There is no allegation of any failure to maintain a public road.  There are no allegations of loss due to a physical defect occurring within or on the grounds of buildings used for governmental functions.  Finally, Plaintiffs do not allege that Canfield or its officers or employees violated any state statute which expressly imposes liability, nor do Plaintiffs allege that Canfield or any employee negligently performed a proprietary function.

Plaintiffs' Second Amended Complaint arises out of the provision of police services, which is a governmental function.  O.R.C. §2744.01(C)(2)(a).  By definition, governmental functions cannot be considered a proprietary function.  O.R.C. §2744.01(G)(1)(a).  As Canfield is immune from liability for the performance of a governmental function, it is immune from Plaintiffs' claims for malicious prosecution, abuse of process, false imprisonment, sham legal process, battery, intentional infliction of emotional distress, spoliation and loss of consortium.

Only the exceptions contained in O.R.C. §2744.02(B)(1) to (5) can overcome a political subdivision's immunity.  *Cater v. City of Cleveland,* 83 Ohio St.3d 24 (1998).  There is no exception based upon the doctrine of *respondeat superior*.  O.R.C. §2744.02(B); *Hazley v. City of Akron* (July 22, 1998) 9th Dist. No. CA18756, 1998 WL 417391.  Further, to the extent that Plaintiffs' Second Amended Complaint alleges intentional torts, "Ohio courts have consistently held that political subdivisions are immune under O.R.C. §2744.02 from intentional-tort claims." *Williams v. McFarland Properties, L.L.C.*, 177 Ohio App. 3d 490, 494 (2008).

As shown above, none of the exceptions to immunity apply to Plaintiffs' claims. As there is no applicable exception to immunity, the City of Canfield is immune from Plaintiffs' claims for malicious prosecution, abuse of process, false imprisonment, sham legal process, battery, intentional infliction of emotional distress, spoliation and loss of consortium.

E.    THE INDIVIDUAL DEFENDANTS ARE IMMUNE FROM PLAINTIFFS' STATE LAW CLAIMS.

O.R.C. §2744.03(A)(6) provides immunity from liability to employees of political subdivisions. The City of Canfield is a political subdivision under O.R.C. §2744.01(F). Chief Colucci, Assistant Chief Weamer, Det. McGivern and Officer Lamping, as employees of the City, are therefore entitled to immunity under O.R.C. §2744.03(A)(6) which provides:

> (A) In a civil action brought against a political subdivision or an employee of a political subdivision to recover damages for injury, death, or loss to persons or property allegedly caused by any act or omission in connection with a governmental or proprietary function, the following defenses or immunities may be asserted to establish nonliability: …
>
> (6) … [T]he employee [of a political subdivision] is immune from liability unless one of the following applies:
>
> (a) The employee's acts or omissions were manifestly outside the scope of the employee's employment or official responsibilities;
>
> (b) The employee's acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner;
>
> (c) Liability is expressly imposed upon the employee by a section of the Revised Code.

By its terms, O.R.C. §2744.03 (A)(6) operates as a presumption of immunity. *Cook v. Cincinnati*, 103 Ohio App.3d 80, 90 (1995). As such, an employee cannot be held personally liable for mere negligence, but may only be held liable for actions that fall into one of these particular exceptions. *Fabrey v. McDonald Village Police Dept.*, 70 Ohio St.3d 351 (1994).

None of these exceptions apply to this case.  No section of the Revised Code expressly imposes liability on the individual Defendants for their actions.  There does not appear to be any dispute that they were acting within the scope of their respective employment.  The only possible immunity exception would apply if the individual Defendants acted in bad faith, with malicious purpose or in a wanton or reckless manner.

"Malice" is the willful and intentional design to harm another by inflicting serious injury without excuse or justification.  *Garrison v. Bobbitt*, 134 Ohio App.3d 373, 384 (1999).  "Bad faith" implies sinister motive and also refers to that which has "no reasonable justification." *Hicks v. Leffler*, 119 Ohio App.3d 424, 429 (1997).  "Wanton" misconduct refers to a failure to exercise any care whatsoever.  *Fabrey v. McDonald Village Police Department*, 70 Ohio St.3d 351, 356 (1994).  "Recklessness" is a perverse disregard of a known risk.  *O'Toole v. Denihan*, 118 Ohio St.3d 374 (2008), at paragraph 3 of the syllabus.  The actor must be conscious that his conduct will in all probability result in injury.  *Id.*

The individual Defendants did not act with a malicious purpose, in bad faith or in a wanton or reckless manner in light of the information known to them at the time of B.R.'s arrest. Chief Colucci ensured that Children Services was involved in the interviews and that the interviews were timely given the safety concerns raised by the allegations.  Colucci Depo at 96. Assistant Chief Weamer and Det. McGivern reviewed the interviews of the three girls, and discussed those interviews with Kim Woods and Prosecutor Modarelli.  Weamer Depo at 120. Det. McGivern interviewed B.R.  McGivern Depo at 77.  Chief Colucci, Assistant Chief Weamer, and Det. McGivern reviewed the case.  Colucci Depo at 44, 51.  Prosecutor Modarelli was consulted with respect to whether probable existed for the arrest and criminal charges.

Weamer Depo at 120.  Officer Lamping's role was limited to observing the process, being in field training at the time.  Lamping Depo at 21.

These facts taken together do not amount to bad faith, malicious purpose, wanton or reckless conduct as it pertains to the investigation, arrest and prosecution of B.R.  As such, Chief Colucci, Assistant Chief Weamer, Det. McGivern and Officer Lamping are immune from Plaintiffs' state law claims pursuant to O.R.C. §2744.03(A)(6).

## F.    THE CANFIELD DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON THE CLAIM FOR MALICIOUS PROSECUTION AS THERE WAS PROBABLE CAUSE FOR THE CHARGES.

Count II of the Second Amended Complaint alleges a state law claim for malicious prosecution.  To succeed on a claim for malicious prosecution, the plaintiff must prove (1) malice in instituting or continuing the prosecution; (2) lack of probable cause; and (3) termination of the prosecution in favor of the accused.  *Rogers v. Barbera*, 170 Ohio St. 241 , at syllabus 1 (1960).  Malice is an improper purpose, or any purpose other than the legitimate interest of bringing an offender to justice.  *Criss v. Springfield Township*, 56 Ohio St.2d 82, 85 (1990).  Malice can be inferred from the lack of probable cause.  *Melanowski v. Judy*, 102 Ohio St. 153, at syllabus 1 (1921).  The determinative issue is not whether a particular crime was actually committed, but whether there was a reasonable ground of suspicion, supported by circumstances sufficiently strong to warrant a cautious man in the belief that the person accused was guilty of the offense with which he was charged.  *McFinley v. Bethesda Oak Hospital*, 79 Ohio App.3d 613, 617 (1992).

As set forth above, the interviews of the alleged victims established probable cause for B.R.'s prosecution.  The existence of probable cause bars Plaintiffs' claim for malicious prosecution, and entitles the Canfield Defendants to judgment in their favor on that claim.

24

**G.    THE CANFIELD DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON THE CLAIM FOR MALICIOUS PROSECUTION AS THEY DID NOT INITIATE THE PROCEEDINGS.**

The criminal charges against B.R. were instituted only after advice and consultation with the County prosecutor, Anissa Modarelli.  "A prosecutor's involvement in the decision to prosecute usually insulates the complainants from civil liability for malicious criminal prosecution." *Baryak v. Kirkland*, 137 Ohio App.3d 704, 711 fn. 5 (2000).  If an informer merely provides a statement of his belief of criminal activity and leaves the decision to prosecute entirely to the uncontrolled discretion of the prosecutor, the informer is not regarded as having instituted the criminal proceedings. *Robbins v. Fry,* 72 Ohio App.3d 360, 363 (1991). The protected status of informer is only lost if there is a desire, direction, request or pressure for the initiation of criminal proceedings.  *Id.* at 362.

Chief Colucci, Assistant Chief Weamer, Det. McGivern and Officer Lamping did not indicate any desire, direction, request or pressure for criminal proceedings.  Rather, it was solely the decision of Pros. Modarelli whether to bring criminal charges against B.R.  Modarelli Depo at 16.  As the prosecutor made the decision without any influence from the Canfield Defendants, they are entitled to judgment in their favor with respect to the claim for malicious prosecution.

**H.    THE CANFIELD DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON THE CLAIM FOR FALSE IMPRISONMENT AS THERE WAS PROBABLE CAUSE FOR THE ARREST.**

Plaintiff B.R. alleges that she was falsely imprisoned as a result of the allegations.  False imprisonment occurs "when a person confines another intentionally without lawful privilege and against his consent within a limited area for any appreciable time, however short." *Bennett v. Ohio Department of Rehabilitation and Correction*, 60 Ohio St.3d 107, 109 (1991).

> A suit for false arrest or false imprisonment is the proper action where the aggrieved party is arrested without legal process, or under a void process; but

25

> where the process on which the arrest is made is regular on its face, but is sued out maliciously and without probable cause, the remedy is an action for malicious prosecution.
>
> ***
>
> False imprisonment per se is not concerned with good or bad faith, malicious motive, or want of probable cause on the part of the prosecuting witness, or the officer causing the imprisonment. If the imprisonment was *lawful*, it is not the less lawful that any or all of the foregoing elements existed. These elements relate to an action [f]or malicious prosecution, but are not essential to an action in false imprisonment.

> *Rogers v. Barbera*, 170 Ohio St. 241, 244 (1960)(emphasis in original).

Allegations that the arrest was made based on malicious motives or without probable cause are irrelevant to a false imprisonment claim. *Rogers, supra*. Rather, the issue is whether the Canfield Defendants had authority to arrest Plaintiff.

> B.R.'s arrest was authorized by O.R.C. §2935.03, which provides in pertinent part that:

> When there is reasonable ground to believe that an offense of violence, … has been committed within the limits of the political subdivision in which the peace officer is appointed, employed, or elected … a peace officer described in division (A) of this section may arrest and detain until a warrant can be obtained any person who the peace officer has reasonable cause to believe is guilty of the violation.

> O.R.C. §2935.03(B)(1).

B.R. was charged with violating O.R.C. §2907.02 (rape), and O.R.C. §2907.05 (gross sexual imposition). An "offense of violence" is defined to include violations of O.R.C. §2907.02 and O.R.C. §2907.05. O.R.C. §2901.01(A)(9)(a). B.R. alleged to have committed an "offense of violence" such that the Canfield Defendants were privileged to arrest her for those charges. In compliance with the statute, B.R. was brought before the Court on the Tuesday after her arrest. Her initial hearing had been set for Monday, the first business day after her arrest. However, due to circumstances outside the control of the Canfield Defendants, the hearing was reset to Tuesday. B.R.'s arrest complied with O. R.C. §2935.03(B)(1) and was a valid legal arrest.

26

The arrest process was valid and done in accordance with the law, though Plaintiffs allege it was malicious and without probable cause.  These allegations, however, are irrelevant to a claim of false imprisonment.  *Rogers, supra.*  As Plaintiffs cannot prove that the arrest was without a lawful privilege, they cannot maintain a claim of false imprisonment.

**I.**   **PLAINTIFF B.R. CANNOT SUCCEED ON HER CLAIM FOR ABUSE OF PROCESS AS SHE CANNOT PROVE AN IMPROPER MOTIVE FOR HER PROSECUTION.**

Count III of the Second Amended Complaint alleges that the filing of criminal charges constituted an abuse of process. To succeed on a claim for abuse of process, the plaintiff must prove (1) that there was a legal proceeding set in motion with proper form and with probable cause, (2) the proceeding was perverted to accomplish an ulterior purpose for which it was not designed, and (3) direct damage resulted from the wrongful use of process.  *Yaklevich v. Kemp, Schaeffer & Rowe Company, L.P.A.*, 68 Ohio St.3d 294 at syllabus 1 (1994).

In this case, Plaintiffs allege the criminal charges were the result of a desire to "make a strong showing of police authority and/or to protect the personal and political relationships of the Defendants."  Second Amended Complaint at ¶139.  The evidence does not support these allegations.  There are no personal or political relationships between the parties.  Retired Chief Blystone knew Mr. Slater from mutual membership at a hunting club.  Blystone Depo at 13-14. He had no social relationship with Mr. Slater apart from that venue.  Deposition of Donald Slater, November 22, 2013 at 74.  Mr. Blystone did not exert any pressure or influence over the investigation and did not maintain any strong ties to the Police Department or Chief Colucci. There is also no evidence that the Canfield Defendants were trying to make a "strong showing of police authority."

To the extent that Plaintiffs claim the criminal prosecution was the result of allegedly malicious motives, this is not sufficient to support a claim for abuse of process.

> Abuse of process does not lie for the wrongful bringing of an action, but for the improper use, or 'abuse,' of process. * * *  Thus, if one uses process properly, but with a malicious motive, there is no abuse of process.

*Kavlich v. Hildebrand* (March 12, 2009) 8th Dist. No. 91489, 2009-Ohio-1090, ¶16. The 8th District Court of Appeals recognized that "there is no liability [for abuse of process] where the defendant has done nothing more than carry out the process to its authorized conclusion, even though with bad intentions." *Id.* at ¶17.   Liability does not lie even though a plaintiff alleges ill-will by the defendants or that the criminal charges were frivolous.  *Id.* at ¶22.

As there is no evidence the criminal proceedings were perverted to accomplish something other than their intended purpose, Plaintiffs cannot maintain their claim for abuse of process, even in the presence of allegations that the Canfield Defendants acted maliciously.

### J.      PLAINTIFFS HAVE FAILED TO STATE A CLAIM FOR A SHAM LEGAL PROCESS.

Count Five of the Second Amended Complaint alleges a violation of O.R.C. §2921.52 for allegedly initiating sham proceeding and filing a sham process.  These allegations are based on the filing of the criminal complaints.  Second Amended Complaint at ¶150.

O.R.C. §2921.52 prohibits a person from:

(1) Knowingly issue, display, deliver, distribute, or otherwise use sham legal process;

(2) Knowingly use sham legal process to arrest, detain, search, or seize any person or the property of another person;

(3) Knowingly commit or facilitate the commission of an offense, using sham legal process;

(4) Knowingly commit a felony by using sham legal process.

O.R.C. §2921.52(B).

A "sham legal process" is defined as:

> (4) "Sham legal process" means an instrument that meets all of the following conditions:
>
> (a) It is not lawfully issued.
>
> (b) It purports to do any of the following:
>
> (i) To be a summons, subpoena, judgment, or order of a court, a law enforcement officer, or a legislative, executive, or administrative body.
>
> (ii) To assert jurisdiction over or determine the legal or equitable status, rights, duties, powers, or privileges of any person or property.
>
> (iii) To require or authorize the search, seizure, indictment, arrest, trial, or sentencing of any person or property.

A sham legal process typically involves papers falsified to appear to have been issued by a court or order authority.  *See State v. Roten*, 149 Ohio App.3d 182 (2002) (false judgments or indictments); *State v. Martin* (Nov. 24, 2006) 11th Dist. No. 2005-T-004, 2006-Ohio-6202 (alternative sentencing report and probation orders).

The criminal complaints did not constitute a sham legal process.  The complaints were lawfully issued after an independent review and determination by the prosecutor that probable cause existed for the complaints.  They were properly filed with the juvenile court.  There was no "sham" involved in filing the complaints.  The criminal complaints do not meet the definition of a "sham legal process" contained in O.R.C. §2921.52.

Further, O.R.C. §2921.52(C) provides that "[i]t is an affirmative defense to a charge under division (B)(1) or (2) of this section that the use of sham legal process was for a lawful purpose."  In this case, the criminal complaints were signed in connection with the criminal prosecution of B.R. which was instituted based on probable cause to believe that a crime had

been committed.  As the complaints were issued in connection with a lawful purpose, Plaintiffs

cannot maintain their claim under O.R.C. §2921.52.

**K.      THERE IS NO EVIDENCE OF AN IMPROPER TOUCHING NEEDED TO SUPPORT A BATTERY CLAIM.**

Plaintiffs allege that the Canfield Defendants committed battery when B.R. was searched,

handcuffed, transported and processed at the juvenile detention center.   Second Amended

Complaint at ¶158. To succeed on a claim for battery, the plaintiff must prove the defendant

intended to cause a harmful or offensive contact, and that a harmful contact resulted.  *Love v.

City of Port Clinton*, 37 Ohio St.3d 98, 99 (1988).  Privilege is a defense to a battery claim.  *Id.*

Police officers are privileged to commit battery during the course of an arrest, provided that

excessive force is not used.  *Alley v. Bettencourt*, 134 Ohio App.3d 303, 313 (1999).  Plaintiffs

do not allege that excessive force was used during the arrest. Officer Mark Meshula, who was

responsible for transporting B.R., does not recall touching her and confirms that B.R. was not

handcuffed for the transport to the juvenile detention center.  Meshula Depo at 14, 54.  There is

no evidence of any touching of B.R., much less a touching that would be in excess of the

privilege to execute the arrest.  As such, the Canfield Defendants are entitled to judgment in their

favor with respect to the claim for battery.

**L.      PLAINTIFFS CANNOT ESTABLISH THE EXTREME AND OUTRAGEOUS CONDUCT NEEDED TO SUPPORT A CLAIM FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS.**

Count VIII of the Second Amended Complaint alleges a claim on behalf of all Plaintiffs

for the intentional infliction of emotional distress.  In order to recover on a claim of intentional

infliction of emotional distress, a plaintiff must prove four elements: (1) that the actor either

intended to cause emotional distress or knew or should have known that actions taken would

result in serious emotional distress to the plaintiff, (2) that the actor's conduct was so extreme

and outrageous as to go "beyond all possible bounds of decency" and was such that it can be considered as "utterly intolerable in a civilized community," (3) that the actor's actions were the proximate cause of plaintiff's psychic injury, and (4) that the mental anguish suffered by plaintiff is serious and of a nature that "no reasonable man could be expected to endure it." *Roelen v. Akron Beacon Journal,* 199 F.Supp.2d 685, 696 (N.D.Ohio 2002). Conduct that is merely cruel or insensitive does not rise to the level of extreme and outrageous conduct necessary to state a claim for intentional infliction of emotional distress. *Roelen,* 199 F.Supp.2d at 696.

In this case, the Canfield Defendants investigated B.R. for the alleged rape of her friends. The three girls gave consistent statements and were found credible by those who observed the interviews.  Woods Depo at 135, McGivern Depo at 65, Modarelli Depo at 57, 90, Weamer Depo at 40, Lamping Depo at 110.  Those statements provided probable cause for the arrest.  The existence of probable cause for an arrest bars a claim for intentional infliction of emotional distress, even if the investigation leading to that arrest was allegedly incomplete.  *Ahlers v. Schebil*, 188 F.3d 365, 375 (6th Cir. 1999); *see also Voyticky v. Village of Timberlake, Ohio*, 412 F.3d 669, 678 (6th Cir. 2005).  As there was probable cause for B.R.'s arrest, the Canfield Defendants are entitled to judgment in their favor with respect to the claim for intentional infliction of emotional distress.

**M.    THE LOSS OF CONSORTIUM CLAIM FAILS AS THERE ARE NO UNDERLYING TORTIOUS ACTS.**

Section 1983 creates an entirely personal cause of action which can only be brought by the alleged victim.  *Claybrook v. Birchwell*, 199 F.3d 350, 357 (6th Cir. 2000).  An individual may not bring a loss of consortium claim for injuries as a result of another's alleged constitutional injuries.  *Id.*; *see also Barber v. Overton*, 496 F.3d 449, 458 (6th Cir. 2007).  To the

31

extent Plaintiffs' loss of consortium claims are based upon an alleged violation of B.R.'s constitutional rights, these claims are not recognized under federal law.

Michael and Renee Rubesich can similarly not maintain a claim under state law.  A state law claim for loss of consortium is derivative and is dependent upon the defendant's having committed a legally cognizable tort upon another who suffers bodily injury.  *Campbell v. PMI Food Equipment Group, Inc.*, 509 F.3d 776, 790-791 (6th Cir. 2007).  Bodily injury does not include nonphysical harms.  *Id.* at 791.  B.R. does not contend that she was physically mistreated in any way by the Canfield Defendants.  Further, as B.R.'s claims against the Canfield Defendants fail so must her parents' claim derivative claim for loss of consortium fail.  *Eilerman v. Cargill Inc.*, 195 Fed.Appx. 314, 320 (6th Cir. 2006).

## N.    DETECTIVE MCGIVERN IS ENTITLED TO JUDGMENT ON PLAINTIFFS' SPOLIATION CLAIM.

Count XI of the Second Amended Complaint alleges that Det. McGivern engaged in spoliation and the destruction of public records.  To succeed on a claim for spoliation, Plaintiffs must prove (1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed with a culpable state of mind; and (3) that the destroyed evidence was relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support the claim or defense.  *Beaven v. United States Department of Justice*, 622 F.3d 540, 553 - 54 (6th Cir. 2010).  To obtain a sanction for spoliation, the plaintiff must prove each of these three prongs.  *Adkins v. Wolever*, 692 F.3d 499, 504 (6th Cir. 2012).

> An adverse inference for evidence spoliation is appropriate if the Defendants knew the evidence was relevant to some issue at trial and their culpable conduct resulted in its loss or destruction.  This depends on the alleged spoliator's mental state regarding any obligation to preserve evidence and the subsequent destruction.

*Id.*

"The burden falls on the "prejudiced party" to produce some evidence suggesting that a document or documents relevant to substantiating his claim would have been included among the destroyed files." *Owner-Operator Indep. Drivers Ass'n v. Comerica Bank*, 860 F. Supp. 2d 519, 539 (S.D. Ohio 2012)(internal citations omitted).  This issue has been fully briefed by Det. McGiven in his Brief in Opposition to Plaintiffs' Motion for Sanctions, which is incorporated by reference as though fully rewritten herein.  (ECF 80).

Discovery has not revealed any substantive messages relevant to Plaintiffs' claims. Prosecutor Modarelli testified to sending text messages to Det. McGivern during the criminal case.  Modarelli Depo at 239.  Det. McGivern testified that those communications related to dates for the criminal matter and whether she had heard anything from the attorneys.  McGivern Depo at 12.  He also testified to being included on text messages between Pros. Modarelli and Mr. Slater.  *Id.* at 70.  Copies of those messages were produced by Prosecutor Modarelli. Similarly, copies of the text messages between Det. McGiven and School Resource Officer Steve Gartska were preserved by Officer Gartska and produced in discovery.

The records of Det. McGivern's cell phone carrier reveal text messages between he and Mr. Slater starting on September 17, 2012, months *after* the arrest and August 7, 2012 criminal trial of B.R.[1]  These messages would be irrelevant to any determination or evaluation of probable cause to arrest B.R. in April of 2012.  Det. McGivern deleted these messages pursuant to his standard practice, and prior to any notice that there were claims of an improper influence or relationship between Mr. Slater and the police.  McGivern Depo at 10-11.  There is no evidence

---

[1] The City's cell phone carrier, Verizon Wireless, only maintains records for a period of one year. A policy that was only discovered during the course of this litigation.  The records were obtained in August 2013 during written discovery.  Accordingly, no evidence is available to Defendants for transactions occurring prior to August 20, 2012.

of any text messages between Det. McGivern and any of the three girls, the parents of C.M. or the parents of R.B.

As Plaintiffs are unable to show that Det. McGivern had an obligation to preserve the text messages at the time of their destruction, that Det. McGivern had a culpable state of mind, and are unable to show the text messages would have contained information related to the probable cause for B.R.'s arrest, Plaintiffs cannot succeed on their claim for spoliation.

### O.  PLAINTIFFS CANNOT ESTABLISH A VIOLATION OF THEIR RIGHT TO FAMILIAL ASSOCIATION.

The final count of the Second Amended Complaint alleges that the Canfield Defendants violated Plaintiffs' right to familial association by the allegedly improper arrest of B.R.  To succeed on a claim for a violation of the right to familial association, the plaintiff must prove that the governmental action was directed toward a protected aspect of the parent-child relationship, and that any injury was not merely incidental to the action taken.  *Walsh v. Erie County Department of Job and Family Services*, 240 F.Supp.2d 731, 757 (N.D.Ohio 2003).  There is no cognizable constitutional claim where, as here, the interference was derived from and incidental to a claimed violation of an individual's Fourth Amendment rights.  *Id.* at 756.

In this case, the alleged interference with the parent-child relationship stems from the allegedly improper arrest of B.R.  Plaintiffs do not maintain that the Canfield Defendants intended to disrupt the relationship between B.R. and her parents.  To the contrary, the evidence indicates that the Canfield Defendants attempted to keep the family together as long as possible leading up to B.R.'s arrest and further did not oppose B.R.'s release following her initial hearing. Weamer Depo at 140-141, Modarelli Depo at 199, 205.

In *Walsh,* the U.S. District Court for the Northern District of Ohio dismissed the plaintiffs' claim for a violation of their Fourteenth Amendment right to familial association.  In

that case, the plaintiff was allegedly threatened with arrest after refusing to allow the Department of Job and Family Services access to his home to investigate a complaint.  The plaintiff alleged that he was forced to choose between his family's privacy and the allegedly improper inspection and search.  The Court found that the evidence was insufficient to state a claim as there was no state action directed towards interfering with the family relationship.  Any interference with that relationship was the direct result of the allegedly improper search.

This distinction has been further recognized by the U.S. District Court for the Eastern District of Michigan.  That court has held that

> [f]ederal courts have recognized a protected right to familial association, and [have] allowed parents or their children to recover under § 1983 for alleged unconstitutional conduct primarily directed toward another family member[, but] have done so *only where the plaintiffs have alleged a permanent, physical loss of association of an immediate family member as a result of unlawful state action.*
>
> *Jenkins v. Orchards Children's Services*, Case No. 11-13356, 2012 WL 3639116, *6 (E.D. Mich. 2012)

In alleging their claim, Plaintiffs rely on *O'Donnell v Brown*, 335 F.Supp.2d 787 (E.D.Mich. 2004).  In *O'Donnell*, the parents left their six children by themselves for a weekend.  The two oldest children were 16 and 17 years old.  When those siblings briefly left the house and left a 12 year old in charge of his three younger siblings, including a 6 month old, the children's aunt contacted 911 to report child neglect.  Several interactions occurred, and the oldest son was ultimately arrested for refusing to allow the police into the house to respond and investigate the complaint.  He was arrested on a Saturday night/Sunday morning.  Upon his arrest, the children were removed from the home and placed with their grandmother.  The children were reunited with their family the following Monday following a court's dismissal of the charges.

The parents alleged violations of their Fourteenth Amendment rights, alleging a deprivation of both procedural and substantive due process as a result of the removal of their

children. The court granted judgment in their favor, finding that the parents had sufficiently shown violations of both rights. Specifically, the court held that the parents were entitled to procedural due process rights before their children were removed from the home, and that the parents had substantive due process rights to familial integrity which were impinged without a sufficiently compelling state interest.

The *O'Donnell* case is in line with the *Walsh* holding. The state action alleged in *O'Donnell* - the removal of the children in response to a neglect complaint - was precisely the type of action contemplated by *Walsh*. That case involved state action designed to interrupt the parent-child relationship. This case, however, is more akin to *Walsh*. The Canfield Defendants did not proceed with the intention of separating B.R. from her parents, nor was that the focus of their actions. Rather, the separation was the unfortunate and necessary result of B.R.'s arrest, and resultant alleged violation of her Fourth Amendment rights.

Plaintiffs seek to extend the little precedent that exists to a situation where an individual is arrested. If accepted, this argument would give rise to a constitutional violation every time an individual is arrested and that individual has a child or close family member. Such an interpretation is not supported by the current case law, and cannot be permitted to exist.

The Canfield Defendants' focus was on investigating a possible crime. The actions taken which resulted in the separation of B.R. from her parents arose out of that investigation. As such, Plaintiffs are unable to state a constitutional claim for a violation of their right to familial association. The Canfield Defendants are accordingly entitled to judgment in their favor.

**P.    MICHAEL AND RENEE RUBESICH DO NOT HAVE A CLAIM FOR A VIOLATION OF THE RIGHT TO FAMILIAL ASSOCIATION.**

The Second Amended Complaint alleges a Fourteenth Amendment claim on behalf of all Plaintiffs for an alleged violation of their right to familial association. Michael and Renee

36

Rubesich, as the parents of B.R., have no direct claim for a violation of this right as any alleged violation belongs solely to B.R.

A claim for a violation of a constitutional right under 42 U.S.C. §1983 is "entirely personal to the direct victim of the alleged constitutional tort." *Foos v. City of Delaware*, 492 Fed.Appx. 582, 592 (6th Cir. 2012).  Only that alleged victim may bring a §1983 claim.  *Id.*  An individual who has sustained a claim of emotional distress, loss of a loved one or other consequent collateral injuries does not have a cause of action under §1983.  *Id.* at 593.

In *Foos*, the Sixth Circuit Court of Appeals dismissed a parents' claim for a violation of their right to familial relationships as a result of the death of their son following his detention by the police.  The Court recognized that the parents had sustained emotional distress as a result of their son's death; however, the Court held that those claims were not cognizable as only the son was the alleged victim of the police department's detention and actions.

This law was further accepted and extended by the U.S. District Court for the Southern District of Ohio which denied a minor child's claim for a violation of his Fourteenth Amendment right to familial association based upon the allegedly unconstitutional arrest of his mother. *LeFever v. Ferguson*, Case Nos. 2:11-cv-935, 2:12-cv-664, 2013 WL 1324299 (S.D.Ohio 2013). The District Court held that the minor child's claim was merely derivative of his mother's claim for an alleged arrest without probable cause, even though the minor child was deprived of his mother's companionship as a result of her allegedly unconstitutional arrest.  *Id.* at *6.  The state actions were directed at the mother, and the son's resultant loss was found to be a "collateral injury" of the alleged violations of the mother's constitutional rights.  *Id.*

Similarly, B.R.'s constitutional rights were allegedly violated as a result of her arrest. There are no actions directed towards the parents, and the injury they arguably sustained is the

derivative injury of emotional distress resulting from B.R.'s allegedly unconstitutional detention. This derivative claim is not cognizable under §1983. *Foos, supra* at 593.

Q.   **THE INDIVIDUAL DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY ON PLAINTIFFS' CLAIM FOR A VIOLATION OF THEIR RIGHTS TO FAMILIAL ASSOCIATION.**

Even assuming that Plaintiffs have stated a claim for a violation of their Fourteenth Amendment right to familial association, which the Canfield Defendants deny, the individual Defendants are entitled to qualified immunity from that claim as the law is not clearly established and a reasonable officer would not have believed that his conduct violated Plaintiffs' constitutional rights. As shown above, Plaintiffs' Fourteenth Amendment rights to familial association were not violated, accordingly the officers are entitled to qualified immunity.

Moreover, the law in this area is not clearly established. While the requirements for children's services to follow prior to removing children from the home may have been clearly established at this time, there is no similar guidance for officers arresting individuals for alleged crimes, and how that arrest impacts the Fourteenth Amendment right to familial association. *See Kovacic v. Cuyahoga County Department of Children and Family Services*, 724 F.3d 697, 699-700 (6th Cir. 2013) (holding children's services obligations under Fourteenth Amendment were clearly established). The only case which addresses a similar situation is that of *Walsh*, wherein the U.S. District Court for the Northern District of Ohio drew the distinction between actions designed to interfere with the parent-child relationship, such as removals of the children by children's services, and those actions which incidentally interfere with the familial relationship, such an arrest or detention for criminal reasons.

Cases have similarly discussed the unavailability of a Fourteenth Amendment claim based upon an alleged violation of another's constitutional rights, as established in *Foos* and

*LeFever, supra*.  However, these cases did not outline whether and how the direct victim of the allegedly unconstitutional conduct could establish a Fourteenth Amendment claim based upon the state action.  The cases further would lead a reasonable officer to believe that the arrest of B.R. would not result in any violation of her parents' constitutional rights given the clear guidance prohibiting these types of derivative claims.

In order for a right to be clearly established for purposes of the qualified immunity analysis, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Russo v. City of Cincinnati,* 953 F.2d 1036, 1042 (6th Cir. 1992).  In light of the lack of guidance on the counters of this right, Plaintiffs' alleged right to familial association can hardly be said to be clearly established.  Similarly, in light of the express law from the Sixth Circuit Court of Appeals prohibiting derivative Fourteenth Amendment claims from family members, a reasonable officer would not have believed that an arrest of B.R. would have resulted in a violation of the parents' constitutional rights.  The individual Defendants are accordingly entitled to qualified immunity.

## III.    CONCLUSION

Plaintiffs' claims center around the arrest and prosecution of B.R. for the alleged rapes of three of her friends.  The Canfield Defendants received and investigated the complaints with the assistance of Mahoning County Children Services, and evaluated the existence of probable cause with the assistance of the prosecutor.  While it was ultimately learned post-arrest that some of the girls were not entirely forthcoming in their initial statements, there was no reason to question the veracity of the girls' statements at the time of B.R.'s arrest.  Given this, the presumption of probable cause stands.  In fact, two police officers, a trained child services worker and the prosecutor found the girls to be credible.  These statements provided the officers with probable

39

cause to arrest and charge B.R.  The existence of probable cause precludes the claims in the Second Amended Complaint.

Plaintiffs are also unable to show that any policy, custom or practice of the City resulted in any violation of Plaintiffs' constitutional rights.  There is also no evidence that Defendants had any intent to interfere with the parent-child relationship such that Plaintiffs cannot maintain their claims for a violation of their Fourteenth Amendment right to familial association.

Even if the Court determines that there may not have been probable cause to arrest, the individual Defendants are entitled to qualified immunity on the constitutional issues as reasonable officers could have disagreed on whether probable cause existed.  There is further no clearly established law that would have alerted a reasonable officer that B.R.'s arrest would violate the Fourteenth Amendment right to familial association.

Based upon the foregoing, Defendants Brian McGivern, Chief Chuck Colucci, Officer Timothy Lamping, Sergeant Scott Weamer and City of Canfield, respectfully request that the Court grant judgment in their favor with respect to Plaintiffs' claims against them.

Respectfully submitted,

MAZANEC, RASKIN & RYDER CO., L.P.A.

*s/Tami Z. Hannon*
JOHN T. MCLANDRICH  (0021494)
TAMI Z. HANNON  (0079812)
100 Franklin's Row
34305 Solon Road
Cleveland, OH 44139
(440) 248-7906
(440) 248-8861 – Fax
Email:   jmclandrich@mrrlaw.com
            thannon@mrrlaw.com

*Counsel for Defendants Brian McGivern, Chief Chuck Colucci, Officer Timothy Lamping, Sergeant Scott Weamer and City of Canfield*