UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

B.R., et al.,                              )          CASE NO. 4:13CV907
                                           )
        Plaintiffs,                       )          JUDGE JOHN R. ADAMS
                                           )
   vs.                                  )
                                           )
                                           )          **MEMORANDUM OF OPINION**
Brian McGivern, et al.,                    )          **AND ORDER**
                                           )
        Defendants.                       )
                                           )

On April 18, 2016, the magistrate judge assigned to this matter issued his Report and recommended that the Court grant Defendants' motion for summary judgment in this matter. Doc. 228. Plaintiffs objected to the Report, and Defendants have responded to those objections. The Court now resolves the pending objections.

There are few things the parties to these proceedings agree upon. However, there can be no real dispute that a tragedy occurred. Innocence was lost. However, whether that tragedy and loss of innocence occurred in the bedroom of an eleven year old girl, in a police interrogation room, or before a juvenile court is sharply disputed. Further, whether one young girl, three young girls, or some combination thereof lost their innocence is also sharply disputed. This Court must now determine whether Plaintiffs' theory of this tragedy is one that warrants submitting this matter to a jury.

## I.  FACTS

The Court will set forth a summary of the facts herein, but also adopts the lengthy, detailed facts as set forth in the Report as no party has claimed any error in those facts. On April 16, 2012, C.M.'s mother read a message written by C.M.'s friend F.S. on the chalkboard in

C.M.'s room.  At the time, both F.S. and C.M. were eleven years old.  The message suggested that F.S. had been "raped by her best friend."  C.M.'s mother informed F.S.'s mother of the message and then spoke directly to C.M. and another of her friends, R.B., another eleven year old girl.  C.M. gave her mother additional details about the alleged rape, including that the alleged attacker was B.R. and that B.R. had also "humped" C.M.  C.M. also provided her mother with a note that F.S. had written about the alleged attack.  Following further discussions, R.B. informing C.M's mother that both she and C.M. had been similarly attacked by B.R.

Upon learning of these allegations, F.S.'s father contacted the former Canfield Chief of Police, David Blystone.  Blystone and F.S.'s father were apparently friends and knew one another from the same gun club.  Blystone advised F.S.'s father to contact law enforcement as quickly as possible and that law enforcement would subsequently inform him of any additional options available to him.  Blystone also then conveyed F.S.'s father's concerns to the current Canfield Chief of Police, Chuck Collucci.  Blystone relayed to Collucci that F.S.'s father would be coming to the station and that he had concerns that F.S. had been sexually assaulted.

On the morning of April 17, 2012, F.S.'s father went to the Canfield police station.  F.S.'s father reported that F.S. claimed to have been forcefully sexually assaulted by B.R. on two separate occasions in February of 2012.  F.S.'s father also reported that C.M. and R.B. had also claimed to have been sexually assaulted by B.R.  As a result of the latter information, Detective Brian McGivern and Officer Timothy Lamping contacted C.M.'s mother.  C.M.'s mother informed the officers of the contents of the chalkboard note and F.S.'s handwritten note.  C.M.'s mother also recounted the details of the discussion she had with C.M. and R.B. in which both accused B.R. of sexual assault.

The officers also contacted R.B.'s mother.  R.B.'s mother confirmed that she had received a call from C.M.'s mother regarding the reported abuse and that she had thereafter discussed the matter with her daughter.  R.B.'s mother indicated that her daughter confirmed the allegations when she questioned her.  R.B.'s mother also told the officers that R.B. had informed her that she had told B.R. she did not want to continue with any type of sexual behavior and that B.R. had responded by spreading rumors that R.B. was a lesbian.

After conducting these initial interviews, Detective McGivern relayed the information to Chief Collucci and had a discussion with Assistant Prosecutor Anissa Modarelli.  Following those discussions, Detective McGivern contacted Children Services and requested their assistance in the investigation of the matter.  Detective McGivern was informed at that time that Children Services would not have a facility to interview the children involved for roughly three weeks.  Rather than wait, Detective McGivern arranged for Children Services to conduct the interviews at the police department.

Children Services employee Kim Woods conducted interviews on April 20, 2012 of F.S., C.M. and R.B.  No officers were physically present in the interview room when Woods conducted her interviews.  The parents of each child, however, were afforded the opportunity to witness the interview via a live feed and the interviews were recorded.  Detective McGivern and Prosecutor Modarelli also watched the interviews via live feed.  At least some portion of the interviews was also viewed by Assistant Chief of Police Scott Weamer.  Following the conclusion of the interviews, Wood, McGivern, Modarelli, Weamer, and Lamping all held the view that the alleged victims were truthful in their statements.  At that same time, Modarelli informed McGivern that sufficient evidence existed to bring charges against B.R.

Prior to making an arrest or seeking formal charges, McGivern interviewed B.R., who was accompanied by her mother.  B.R. was steadfast in her denial of any improper contact with any of the alleged victims.  McGivern, however, "got indicators of her being deceptive" during the interview.  Doc. 192 at 77.  Assistant Chief Weamer also stated that he believed that "there were several occasions where I felt [B.R.] was being deceptive."  Doc. 191 at 48.

McGivern, however, did not conclude the investigation at the time.  Prior to the interviews discussed above, Officer Steve Garstka met with Canfield Middle School's interim principal, Don Dailey.  Garstka conducted this interview because he was the school resource officer.  During the meeting, Dailey provided notes that he had maintained regarding meetings involving the girls involved in this matter.  Dailey's notes indicated that F.S. and B.R. had sent him letters on April 2, 2012, discussing ongoing problems among the girls.  Dailey indicated in his notes that he observed R.B., F.S. and B.R. walking together on April 16, 2012 and that it appeared to him "that possibly things are back on track."  Doc. 211 at 4.  Dailey approached F.S. and R.B. the following day at lunch to determine if they still wanted to meet with him.  Both indicated that they wanted to speak and asked to speak to him immediately.

During that meeting, both R.B. and F.S. indicated that things were not going well with B.R.  Upon Dailey's further inquiry, Dailey noted the following:

> At that time they started to share that there were some 'sexual' encounters or attempts. They spoke of 'lap dancing' and I believe an attempted kiss. At that point I shared that I didn't want to go further into details, and asked if they would like to speak with Mrs. Loree. They said they would like to meet with her and I indicated that I would speak to Mrs. Loree. The girls shared that they had told their parents about the issues and that the police may be involved. The girls also indicated that [C.M.] had a recent encounter with [B.R.].

Doc. 211 at 4.

4

In addition to this information from Dailey, McGivern had learned from the interviews that both the accusers and B.R. had claimed that bullying was an ongoing issue with both asserting that the other faction was the bully.  As a result, McGivern determined that a second interview of the accusers would be beneficial to ensure they were being truthful and not engaged in some form of malicious bullying.  On this occasion, the accusers were each given their *Miranda* rights.  McGivern noted that it was the intent of the officers to arrest the accusers if they admitted to falsifying their allegations.  The accusers, however, did not, material to the criminal allegations, alter their accounts during these second interviews.

Following these second interviews, B.R. was arrested by McGivern and taken to the juvenile holding facility.  B.R.'s initial arraignment was set for the following Monday, April 22, 2012, but was rescheduled for the following day due to a scheduling conflict.  Following that hearing, B.R. was placed on home detention and placed in the care of her grandmother.

Following the arrest, the investigation continued.  In May, B.R. filed a criminal complaint alleging that R.B. had sexually assaulted her.  While no charges resulted from that complaint, it led to a further follow up by McGivern with R.B.  During that follow up, R.B. informed McGivern that the sexual conduct that she had previously described had occurred with B.R., but that it was not the result of force.  Instead, R.B. indicated that she consented to the conduct following repeated urging by B.R.

This deviation from R.B.'s original allegations also caused C.M. and F.S. to be interviewed once more.   During her interview, C.M. admitted that some form of consensual conduct occurred between her and B.R. but that B.R.'s conduct went well beyond the scope of her consent.  C.M. maintained that sexual conduct occurred with B.R. without her consent.  In her follow-up interview, F.S. admitted that she had witnessed B.R. and R.B engage in what

5

appeared to be consensual sexual contact.  F.S. also admitted that she lied when she told McGivern that B.R. had shown her pornography.  F.S. admitted that R.B. had shown her pornography and told her to say that B.R. was instead the one who had shown her the pornography.  F.S., however, maintained that she was being truthful in her claim that B.R. forcibly raped her.

Ultimately, B.R.'s juvenile matter proceeded forward to adjudication.  The allegations against B.R. were found to be "Not True."  With the above factual background in place, B.R. and her parents filed the instant suit on April 23, 2013.  In its current form, the complaint alleges a § 1983 cause of action based on a Fourth Amendment violation, a malicious prosecution claim, an abuse of process claim, a false imprisonment claim, an Ohio Revised Code § 2921.52 claim, a battery claim, an intentional infliction of emotional distress claim, a *Monell* claim, and a loss of consortium claim.  On April 18, 2016, the Magistrate Judge recommended granting summary judgment in favor of the Defendants.  Plaintiffs have objected to the Report, and the Court now reviews their objections under the same standards properly set forth by the Report.

## II.    <u>LEGAL STANDARD FOR SUMMARY JUDGMENT</u>

Under Federal Rule of Civil Procedure 56(a), the Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  The party moving for summary judgment may satisfy its burden under Rule 56 in either of two ways: (1) "submit affirmative evidence that negates an essential element of the nonmoving party's claim," or (2) "demonstrate to the Court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 331 (1986).

A movant is not required to file affidavits or other similar materials negating a claim on which its opponent bears the burden of proof, so long as the movant relies upon the absence of the essential element in the pleadings, depositions, answers to interrogatories, and admissions on file. *Id.*  Likewise, the moving party's burden of production "may be discharged by 'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case."  *Id.* at 325.

In reviewing summary judgment motions, this Court must view the evidence in a light most favorable to the non-moving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970); *White v. Turfway Park Racing Ass'n.*, 909 F.2d 941, 943-44 (6th Cir. 1990). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards. Thus, in most civil cases the Court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict." *Id.* at 252.

Summary judgment is appropriate whenever the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322.  Moreover, "the trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989), *citing Frito-Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1034 (D.C. Cir. 1988).  The non-moving party is under an affirmative duty to point out specific facts in the record as it has been established which create a genuine issue of material fact. *Fulson v. Columbus*, 801 F.Supp. 1, 4

(S.D.Ohio 1992). The non-movant must show more than a scintilla of evidence to overcome summary judgment; it is not enough for the non-moving party to show that there is some metaphysical doubt as to material facts. *Id.*

## III. ANALYSIS

### A. § 1983 Claim

In her first claim, B.R. asserts that her Fourth Amendment rights were violated when she was seized and arrested by police without probable cause. The Report recommended granting summary judgment in favor of Defendants on this claim. The Court now reviews Plaintiffs' objections to the Report.

The Fourth Amendment protects the right of individuals to be free from improper arrest and detention. U.S. Const. amend. IV ("The right of people to be secure in their persons ... against unreasonable seizures ... shall not be violated."). "[A] warrantless arrest by a law officer is reasonable under the Fourth Amendment where there is probable cause to believe that a criminal offense has been or is being committed," *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004), and the "validity of the arrest does not depend on whether the suspect actually committed a crime." *Michigan v. DeFillippo*, 443 U.S. 31, 36 (1979). Accordingly, "[i]n order for a wrongful arrest claim to succeed under § 1983, a plaintiff must prove that the police lacked probable cause." *Fridley v. Horrighs*, 291 F.3d 867, 872 (6th Cir.2002) (citing *Painter v. Robertson*, 185 F.3d 557, 569 (6th Cir.1999)).

"Probable cause exists if the facts and circumstances known to the officer warrant a prudent man in believing that the offense has been committed." *Henry v. United States*, 361 U.S. 98, 102 (1959); *see also Beck v. Ohio*, 379 U.S. 89, 91 (1964); *Illinois v. Gates*, 462 U.S. 213, 238 (1983). The inquiry "depends upon the reasonable conclusion to be drawn from the facts

known to the arresting officer at the time of the arrest," *Devenpeck*, 543 U.S. at 152, where supported by "reasonably trustworthy information." *Beck*, 379 U.S. at 91. No overly-burdensome duty to investigate applies to officers faced with the prospect of a warrantless arrest. In initially formulating probable cause, they need not "investigate independently every claim of innocence." *Gardenhire v. Schubert*, 205 F.3d 303, 318 (6th Cir.2000). And after the officer determines, on the basis of the facts and circumstances known to him, that probable cause exists, the officer has no further duty to investigate or to search for exculpatory evidence. *Ahlers v. Schebil*, 188 F.3d 365, 371 (6th Cir.1999); *Criss v. City of Kent*, 867 F.2d 259, 263 (6th Cir.1988). However, the initial probable cause determination must be founded on "both the inculpatory *and* exculpatory evidence" known to the arresting officer, *Gardenhire*, 205 F.3d at 318 (emphasis in original); *Estate of Dietrich v. Burrows*, 167 F.3d 1007, 1012 (6th Cir.1999), and the officer "cannot simply turn a blind eye toward potentially exculpatory evidence." *Ahlers*, 188 F.3d at 372; *see also id*. at 371 (noting that officers may not "make hasty, unsubstantiated arrests with impunity"); *Fridley*, 291 F.3d at 873 ("The officer may not ignore information which becomes available in the course of routine investigations."). "In general, the existence of probable cause in a § 1983 action presents a jury question, unless there is only one reasonable determination possible." *Fridley*, 291 F.3d at 872 (quotation marks omitted).

In the context of allegations of sexual assault, the Sixth Circuit has noted:

A law enforcement officer is entitled to rely on an eyewitness identification to establish adequate probable cause with which to sustain an arrest. *United States v. Amerson*, No. 93–6360, 1994 WL 589626, at \*2–3 (6th Cir.1994) (unpublished table decision); *Rainer v. Lis*, No. 92–2436, 1994 WL 33969, at \*2 (6th Cir.1994) (unpublished table decision). An eyewitness identification will constitute sufficient probable cause "unless, at the time of the arrest, there is an apparent reason for the officer to believe that the eyewitness 'was lying, did not accurately describe what he had seen, or was in some fashion mistaken regarding his recollection of the confrontation.'" *Id*. at \*2. This comports with the general notion that, since eyewitnesses' statements are based on firsthand observations,

9

they are generally entitled to a presumption of reliability and veracity. *United States v. Ingram*, No. 92–5367, 1993 WL 5914, at *2 (6th Cir.) (unpublished table decision), cert. denied, 510 U.S. 969, 114 S.Ct. 452, 126 L.Ed.2d 385 (1993).

**Thus, Stiltner's accusation that she had been sexually assaulted by Ahlers, standing alone, was sufficient to establish probable cause**, especially when bolstered by Sheriff's Department's records which confirm that there was a window of time within which the alleged sexual assault could have occurred. It appears, then, that in order to sustain their claim that there are genuine issues of fact regarding the existence of probable cause, Plaintiffs would have to allege that the Defendants had reason to think that Stiltner's eyewitness identification was in some way untruthful or unreliable. Plaintiffs, however, put forth no such allegations. In fact, prior to Ahlers's arrest and up until immediately before the preliminary examination, Stiltner had relayed her allegations to both the Washtenaw County Defendants and to Parsons in a consistent manner

*Ahlers*, 188 F.3d 370-71 (emphasis added). That panel continued:

This, however, does not mean that officers may make hasty, unsubstantiated arrests with impunity. Several cases both from this and other circuits, caution against incomplete, poorly conducted investigations. *See, e.g., Kuehl v. Burtis*, 173 F.3d 646, 651 (8th Cir.1999) (rejecting officer's qualified immunity defense where the officer ignored exculpatory evidence which would have negated a finding of probable cause); *Sevigny v. Dicksey*, 846 F.2d 953, 957–59 (4th Cir.1988) (denying qualified immunity to a police officer who, when faced with two conflicting versions of an event, simply charged plaintiff with two separate, but mutually exclusive, offenses rather than conducting further investigation to ferret out the true course of events); *BeVier v. Hucal*, 806 F.2d 123, 128 (7th Cir.1986) ("A police officer may not close her or his eyes to facts that would help clarify the circumstances of an arrest.").

The matter before us, however, is sufficiently distinguishable from the factual circumstances which caused the courts in *Kuehl*, *Sevigny* and *BeVier* to question whether officers who had performed incompetent investigatory work obtained sufficient probable cause to sustain the respective arrests. In the above cases, officers in the process of determining whether probable cause existed had knowledge of some evidence which was inculpatory and other evidence which was exculpatory, yet without conducting further investigation, simply concluded probable cause did exist. *See Kuehl*, 173 F.3d at 651 (officer ignored eyewitness testimony known to him which would have exculpated plaintiff); *Sevigny*, 846 F.2d at 957–58 (no reasonable officer would have concluded he or she had probable cause to sustain an arrest when the officer, uncertain about the factual situation, arrested the plaintiff on two separate, but mutually exclusive, offenses); *BeVier*, 806 F.2d at 128 (officer who lacked evidence regarding an essential element of the crime charged and failed to further investigate did not have probable cause). In other words, a rational officer considering the evidence in its

totality would have concluded that he or she lacked probable cause, whereas the officers in the above cases concluded probable cause did exist. Our reading of *Kuehl*, *Sevigny* and *BeVier* suggests, then, that officers, in the **process of determining whether probable cause exists**, cannot simply turn a blind eye toward potentially exculpatory evidence known to them in an effort to pin a crime on someone.

*Id.* at 371-72 (emphasis in original).

Furthermore, in resolving the claims before this Court, the undersigned is also mindful of

the holding in *Wesley v. Campbell*:

First, like other circuits, we have expressed serious concern about basing probable cause solely on the uncorroborated allegations of a child. *See, e.g., United States v. Shaw*, 464 F.3d 615, 624 (6th Cir. 2006); *Stoot v. City of Everett*, 582 F.3d 910, 919–20 (9th Cir. 2009); *Cortez v. McCauley*, 478 F.3d 1108, 1116 (10th Cir. 2007). In *Shaw*, we held that a young child's uncorroborated hearsay allegations were too unreliable to form the basis for probable cause. 464 F.3d at 624. Although *Shaw* involved hearsay allegations (rather than direct allegations, as is the case here), its underlying reliability rationale remains relevant. *See* Diana Younts, *Evaluating and Admitting Expert Opinion Testimony in Child Sexual Abuse Prosecutions*, 41 Duke L.J. 691, 697 (1991) ("[S]tudies examining children's suggestibility have found children to be prone to conforming their stories to the beliefs of the questioning adult."), quoted in *United States v. LeBlanc*, 45 Fed. Appx. 393, 399 n.1 (6th Cir.2002). In *Stoot*, the Ninth Circuit correctly read Shaw to reflect concerns about all uncorroborated allegations by children, not just those involving hearsay. 582 F.3d at 922.

Indeed, it appears that no federal court of appeals has ever found probable cause based on a child's allegations absent some other evidence to corroborate the child's story. The district court cited two cases for a contrary rule, *Lowe v. Aldridge*, 958 F.2d 1565 (11th Cir.1992), and *Gerald M. v. Conneely*, 858 F.2d 378 (7th Cir.1988), but in both of those cases, the children's allegations actually enjoyed substantial independent corroboration. In *Shaw*, we conducted a survey of cases basing probable cause in part on children's allegations and likewise found, in each instance, "independent evidence corroborating the children's statements." 464 F.3d at 624–26. Moreover, our independent research has not uncovered a contrary result from another circuit. Indeed, some cases have expressed heightened concerns about the reliability of child-witnesses' allegations when, as here, there are other indicia of unreliability. *See, e.g., Shaw*, 464 F.3d at 624 (holding that child's young age, combined with hearsay nature of statement, made statement insufficient to create probable cause); *Stoot*, 582 F.3d at 919–20 (holding that child's age, when combined with inconsistent statements and confused identifications, rendered allegations too unreliable to create probable cause). We are, of course, all too aware of the difficulties facing police

11

investigations into child sexual abuse. We recognize that a child-victim's testimony often plays an important role in prosecuting the perpetrators of this serious and disturbing crime. Nevertheless, we conclude that J.S.'s young age is a factor bearing on the reliability of his accusations and that Rigney (and the district court) should have given it appropriate weight.

779 F.3d 421, 430-431 (6th Cir. 2015). As can be seen in the above, while expressing concerns, the *Wesley* court did not establish a bright line rule that uncorroborated statements from a child victim could never form the basis of probable cause.[1] In addition, the court noted that "substantial" corroborative evidence existed in *Lowe*, a case in which officers "prepared an affidavit in support of arrest and search warrants based on the repeated, detailed, and explicit statements of three children that they had been ritualistically sexually abused by their father, grandmother, and great-aunt." 958 F.2d at 1571.

In addition to reviewing the issues surrounding probable cause, the Court must also examine the claims of qualified immunity raised by Defendants. Qualified immunity shields a government official from the burden of a lawsuit seeking money for injuries caused by the official's reasonable, discretionary actions. *See Pearson v. Callahan*, 555 U.S. 223, 231 (2009). Once an officer adequately raises the qualified immunity defense, it becomes the plaintiff's burden to defeat it. *Webb v. United States*, 789 F.3d 647, 659 (6th Cir. 2015). On summary judgment, a § 1983 plaintiff must show that, (1) when the evidence is viewed in the light most favorable to her, the state officer violated a constitutional right, and (2) the right that the officer violated was clearly established when the officer acted. *Id.*

Under prong two of the qualified-immunity test, government officials are not liable so long as their belief that there was probable cause to arrest and detain a suspect was reasonable in

---

[1] It does not appear that Plaintiffs have raised the issue of whether these child victim statements cannot, standing alone, support a finding of probable cause. Nevertheless, the Court is mindful of the holding in *Wesley* detailed above.

12

light of the law that was clearly established at the time of the arrest. *Hunter v. Bryant*, 502 U.S. 224, 227–28 (1991) ("Even law enforcement officials who 'reasonably but mistakenly conclude that probable cause is present' are entitled to immunity." (quoting *Anderson v. Creighton*, 483 U.S. 635, 641 (1987))); *Harris v. Bornhorst*, 513 F.3d 503, 511 (6th Cir.2008) ("[A]n arresting agent is entitled to qualified immunity if he or she could reasonably (even if erroneously) have believed that the arrest was lawful, in light of clearly established law and the information possessed at the time by the arresting agent."). And—critically—whether a reasonable officer could believe there was probable cause to arrest and detain is not a jury question but one of law for the court to answer. *Hunter*, 502 U.S. at 227–28 (holding that lower court's statement that "[w]hether a reasonable officer could have believed he had probable cause is a question for the trier of fact," was "wrong" as it "routinely places the question of immunity in the hands of the jury"); *Brown v. Lewis*, 779 F.3d 401, 417 (6th Cir. 2015) ("On the second [qualified-immunity] prong, a court must determine whether there was clearly established law at a sufficient level of specificity to put a reasonable officer on notice that the conduct at issue was unconstitutional."); *Goodwin v. City of Painesville*, 781 F.3d 314, 333 (6th Cir.2015) ("The reasonableness of an officer's probable cause determination is a question of law.").

Upon a review of the totality of the circumstances known to the officers at the time of the arrest, this Court agrees with the Report and finds that probable cause existed to arrest B.R.  In their objections, Plaintiffs do not appear to attack the evidence that was before the officers at the time of the arrest.  Rather, they assert that the officers improperly evaluated that evidence. Specifically, Plaintiffs allege that there are 19 pieces of evidence that when viewed in a light most favorable to them should have caused the officers to find the accusers less than reliable.

1.   Renee Rubesich and B.R. told Defendant McGivern prior to the arrest that F.S. had previously suggested to B.R. that they go to the police and say that "R.B. raped us."

2. Both Michael and Renee Rubesich told Defendant McGivern about a Facebook message from F.S. to B.R. where F.S. threatened to "beat the piss out" of B.R.

3. Both Michael and Renee Rubesich told Defendant McGivern that F.S. was posing as a 15 year old girl on the internet.

4. Renee Rubesich told Defendant McGivern off-camera that F.S. had been using the word "rape" on the internet.

5.   Renee Rubesich told Defendant McGivern that B.R. was very intimidated by R.B.

6. Renee and Michael Rubesich told Defendant McGivern during the interview and off-camera that there was ongoing drama between the accusers and B.R. at school and the principal had been involved.

7. Renee Rubesich and B.R. told Defendant McGivern that the accusers were bullying other girls in school, including Theresa Wasylychyn, and spreading lies about them.

8. B.R. told Defendant McGivern during the interview on multiple occasions that R.B. had jumped on her, got on top of her, and tried to kiss her.

9. B.R. asked Defendant McGivern if there was anything he could do to stop the accusers from bullying her at school.

10. The accusers engaged in sleepovers with B.R. after the alleged rapes occurred.

11. Principal Dailey told Defendants that the accusers and B.R. were getting along with each other on April 16, 2012 after the alleged rapes occurred and on the date the allegations were made.

12. The accusers' early accounts on April 17th to Principal Dailey reflected same-sex sexual experimentation and fell short of any indicia of criminal wrongdoing.

13. The accusers were ten and eleven years old at the time of the alleged incident and as children their statements are inherently unreliable.

 14. The accusers did not come forward about the alleged rapes until months after they allegedly occurred.

15. The parent-witnesses do not support the accusations of the accusers that they were violently raped.

16. Taken in the light most favorable to Plaintiffs, the respective physical sizes of the accusers and B.R. shows that it is unlikely that B.R. would be able to intimidate and/or overpower three separate accusers who were just as big or bigger than her.

17. The accusers did not exhibit the objective signs and behavioral traits associated with sexual abuse.

18. There was no physical evidence whatsoever to support the accusations of the accusers.

19. There was no medical evidence whatsoever to support the accusations of the accusers.

Doc. 229 at 5-7.  Plaintiffs made similar arguments in their opposition to the motion for

summary judgment:

The facts show that Defendants arrested Plaintiff B.R. without making an inquiry into exculpatory evidence that was known to them before they decided to arrest and charge B.R. Note the following exculpatory information:

1) Mr. Dailey saw the girls getting along well on the 16th of April, the same day that the case was initiated by Slater;

2) The Dailey documents showed that the girls had problems with each other and those issues formed a motive for the accusers to lie;

3) The accusers' early accounts on April 17th to Dailey reflected same-sex sexual experimentation and fell short of any indicia of criminal wrongdoing: the accusers talked of lap dancing and "an attempted kiss," not criminal acts;

4) The off-camera statements of B.R.'s parents to the officers regarding issues at school showed the girls were friends having back-and-forth childish drama;

5) The off-camera statements of B.R.'s parents regarding F.S. using the word "rape" showed that the accusers were instigators and aggressors – not victims;

6) The statements B.R. made in her interview (in addition to her outright denials) showed she was being bullied at school and asking Defendant McGivern to help her; and

7) After the three accusers gave their first statements, they were re-questioned and subjected to custodial interrogation so that McGivern could have "a crack at them," as he put it.

Doc. 217 at 28.  There are numerous issues surrounding these latter seven contentions.  For example, there is nothing to suggest that Detective McGivern ignored any of the information learned from Principal Dailey.  In contrast to such an argument, the record reflects that the school resource officer gathered that information from Dailey and advised McGivern prior to any arrest.  As such, it cannot be said that McGivern turned a blind eye to the information.

Similarly, the third item noted by Plaintiffs does not assert that evidence was ignored, but rather places Plaintiffs' spin on Dailey's notes.  While asserting that those notes reflect experimentation fall short of suggesting wrongdoing, Plaintiffs ignore that Dailey stated in those same notes:  "They spoke of 'lap dancing' and I believe an attempted kiss. At that point I shared that I didn't want to go further into details[.]"  Doc. 211 at 4.  The notes then continue that the girls informed Dailey that the police were involved and that the allegations also included C.M.  Thus, far from suggesting simple experimentation, the notes reflect that Dailey halted any discussion of additional details and was informed of the police investigation.  As such, the notes do not undermine the accusers' credibility in the manner suggested by Plaintiffs.

The fourth, fifth, and sixth pieces of alleged exculpatory information all derive from B.R.'s interview.  Once again, there is nothing in the record to suggest that this evidence was ignored when McGivern evaluated probable cause.  The sixth consists of little more than B.R.'s denials, which McGivern was not legally obligated to credit when evaluating probable cause.  The fourth, once again, revisits the girls' school relationship, a subject touched upon in all four of the girls' questioning.

16

Finally, the seventh area of alleged exculpatory evidence is not evidence at all.  Rather, Plaintiffs once again question the investigatory technique chosen by the officers – *Mirandizing* the accusers prior to their second interviews to ensure their truthfulness.  Plaintiffs suggest that such a technique may have been counterproductive given the girls' young ages.  Nothing about such a technique could be considered exculpatory.  If anything, it is suggestive of the subjective beliefs held by McGivern at the time of the interview – beliefs that are not relevant to the reasonable officer standard that this Court must utilize.

The 19 items identified in the objections to the Report suffer from similar flaws.  For example, Plaintiffs assert that officers should have questioned the veracity of the accusers because of the delay in reporting the crime.  However, there is nothing in the record to suggest that this delay was not considered and ultimately rejected based upon first-hand observation of the interviews of both the accusers and the accused.[2]  Instead, Plaintiffs appear to assert that this Court should place some significance on the lack of information placed into the police reports.  Plaintiffs, however, have not identified any legal duty to include every piece of information in the generated reports, nor have they made any showing that the evidence was not properly considered.

Perhaps more importantly, Plaintiffs seek to utilize the summary judgment standard in an improper manner.  It is true that the Court must construe the facts in a light most favorable to the non-moving party.  However, a vast majority of the 19 items identified by Plaintiffs are not disputed, so the Court need not construe them in Plaintiffs' favor.  Instead, Plaintiffs ask that the Court construe the *legal effect* of those facts in their favor.   However, the Report and this Court

---

[2] This item further ignores the record evidence that delays in reporting sexual abuse are not at all uncommon.

have noted the proper legal standard regarding probable cause and that standard does not include the construction proposed by Plaintiffs.

At its heart, the complaint herein is a she-said, she-said matter. However, in this instance, it was the word of three young accusers against one alleged perpetrator.  All four girls agree that there was an opportunity for the conduct to have occurred.  *See Ahlers, supra* (finding that a window of opportunity for the crime to occur can act as corroborating evidence).  Moreover, despite multiple interviews, including one under the threat of perjury, the three accusers stories remained consistent prior to B.R.'s arrest.  As such, the record supports a finding that probable cause existed to arrest B.R.  Moreover, as this is the only reasonable determination from the evidence known at the time of the arrest, it does not create an issue of fact for a jury to resolve.

However, even if the Court were inclined to find that the probable cause determination is an open question that should be submitted to a jury, the officers would still be entitled to qualified immunity.  In evaluating the reasonableness of the officers' determination that probable cause existed, the Court would note that Plaintiffs have not identified any clearly existing law that would suggest that reliance on three separate accusers was unreasonable.  Moreover, Plaintiffs have not identified any clearly established law that would apply to the facts herein to suggest that it should have been apparent to the arresting officers that the accusers were not trustworthy or reliable.  The Court acknowledges, as the Circuit has cautioned, that youthful accusers must be treated with proper caution.  However, there is nothing to suggest that those accusers should be deemed incompetent or inherently suspect, and no facts herein brought their stories into question *prior* to the arrest.

If indeed B.R. committed no offense against her former, young friends, she has suffered an immense tragedy.   The party for her 11th birthday was canceled amidst the allegations and

she was ultimately in juvenile custody for four days.  Those are memories and the innocence of youth that can never be regained.  At the same time, the record does not prove B.R.'s innocence.  A full trial and judicial ruling certainly calls into question the veracity of her accusers.  The law, however, does not support a cause of action for every alleged wrong, regardless of the harm that may flow from it.    Herein, as a matter of law, the record reflects that the officers' determination of probable cause was reasonable.  As such, immunity exists and B.R. cannot pursue her § 1983 action.

### B.  *Monell* claim

Plaintiffs' *Monell* claim fails as a matter of law as the Court concluded above that probable cause existed to arrest B.R.  As there was no underlying Constitutional violation, no failure to train claim can survive.  *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986).

### C. Abuse of Process

Under Ohio law, the elements of a claim for abuse of process are: "(1) that a legal proceeding has been set in motion in proper form and with probable cause; (2) the proceeding has been perverted to attempt to accomplish an ulterior purpose for which it was not designed; and (3) direct damage has resulted from the wrongful use of process." *Voyticky v. Village of Timberlake, Ohio*, 412 F.3d 669, 676 (6th Cir.2005) (quoting *Yaklevich v. Kemp, Schaeffer, & Rowe Co. et al.*, 68 Ohio St.3d 294, 626 N.E.2d 115, 116 (Ohio 1994)). As the Ohio Supreme Court has explained, "abuse of process occurs where someone attempts to achieve through use of the court that which the court is itself powerless to order." *Robb v. Chagrin Lagoons Yacht Club, Inc.*, 75 Ohio St.3d 264, 271, 662 N.E.2d 9 (1996). Thus, "there is no liability [for abuse of process] where the defendant has done nothing more than carry out the process to its authorized conclusion, even though with bad intentions." *Id.* at 118 n. 2, 662 N.E.2d 9 (citing Prosser &

Keeton, *supra*, at 898). In an abuse of process case, "[t]he improper purpose usually takes the form of coercion to obtain a collateral advantage, not properly involved in the proceeding itself, such as the surrender of property or the payment of money, by the use of the process as a threat or a club." *Robb*, 75 Ohio St.3d at 271, 662 N.E.2d 9.

Plaintiffs can point to no ulterior purpose sought through B.R.'s prosecution.  Plaintiffs appear to suggest that the prosecution was borne out of some desire to stop same-sex experimentation or to halt sleepovers.  However, the prosecution neither sought to stop those items, nor was the process perverted in any manner.  The matter was properly tried to a juvenile court judge who found the allegations "Not true."  There is no evidence in the record to support any finding that Defendants attempted to gain any type of collateral advantage over B.R. or her family in any manner.  The abuse of process claim fails as a matter of law.

### D. Malicious Prosecution

Under Ohio law, the elements of malicious prosecution are: (1) malice in instituting or continuing the prosecution; (2) lack of probable cause; and (3) termination of the prosecution in favor of the accused. Trussell v. General Motors Corp., 53 Ohio St.3d 142, 559 N.E.2d 732, 736 (1990)).  Having found above that probable cause existed to arrest B.R., her claim for malicious prosecution fails as a matter of law.

### E. *Gerstein* Hearing

The Court agrees with the Report and Defendants that Plaintiffs have failed to show that Defendants were responsible for ensuring that B.R. received a probable cause hearing within 48 hours of her arrest.  Moreover, the second amended complaint does not plead a due process violation, so the claim could not survive in any event.

20

### F.  Remaining Claims

Similar to the above, Plaintiffs' remaining claims – false imprisonment, battery, intentional infliction of emotional distress, and loss of consortium are all in some manner dependent upon a finding that officers lacked probable cause to arrest B.R.  Having found that probable cause existed, each of these claims fails as a matter of law.

## V.    __CONCLUSION__

It is not lightly that the Court grants Defendants' motion for summary judgment in this matter.  However, the evidence before the arresting officers amply supported a finding of probable cause.   In the end, only four young girls may ever truly know what type of tragedy occurred in early 2012.  However, regardless of the nature of that tragedy, the law offers no remedy with the existing record.  On the one hand, the alleged victims were found by a juvenile court judge to lack credibility and their alleged attacker went unpunished.  On the other hand, the alleged attacker was ripped from her family for four days before her 11th birthday and no doubt branded an outcast and a criminal through rumor and innuendo.  This Court above, however, has found no viable legal claim exists against the officers and city government.  As such, none of the children will walk away from these experiences feeling vindicated.  The record, however, supports one firm conclusion – the officers had probable cause to arrest B.R.  Accordingly, Defendants' motion for summary judgment is GRANTED.  Judgment is hereby entered in favor of Defendants.

IT IS SO ORDERED.


DATE: September 30, 2016                    */s/ John R. Adams*_____
                                           Judge John R. Adams
                                           UNITED STATES DISTRICT COURT